**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Sobelmar Antwerp N.V. | Case No. 15-20423 |
| Sobelmar Shipping N.V. | Case No. 15-20424 |
| SBM-1 Inc. | Case No. 15-20425 |
| SBM-2 Inc. | Case No. 15-20426 |
| SBM-3 Inc. | Case No. 15-20427 |
| SBM-4 Inc. | Case No. 15-20428 |
| Debtors. | (Joint Administration Pending) |

**DECLARATION OF VLADIMIR TERECHTCHENKO IN SUPPORT OF DEBTORS'**
**VOLUNTARY PETITIONS UNDER CHAPTER 11 OF TITLE 11 OF**
**THE UNITED STATES CODE AND FIRST DAY MOTIONS**

I, Vladimir Terechtchenko, state as follows:

## I.  INTRODUCTION

1.      I hold 50.2% of the equity interests in Sobelmar Antwerp N.V. ("Sobelmar Antwerp" and together with the above captioned debtors, the "Debtors") and am employed as its Managing Director. I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code filed on March 17, 2015 (the "Petition Date") and (ii) the relief, in the form of motions, that the Debtors have requested of the Court (the "First Day Motions").

2.      Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

#4805730

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management and the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of each of the Debtors.

4.      This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases. This Declaration describes the Debtors' business, capital structure and material obligations, the events which precipitated these chapter 11 cases, and summarizes the First Day Motions supported by this Declaration.

## II.  BACKGROUND

5.      On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Court"). Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession. The Debtors have requested joint administration of these chapter 11 cases by motion filed concurrently herewith. No trustees or examiners have been appointed in these cases.

**Description of the Debtors' Business**

6.      Sobelmar Antwerp, a Belgium corporation, together with its Debtor and non-debtor subsidiaries, provides worldwide seaborne transportation services, operating a fleet of four handysize bulk carriers (the "Vessels"). Each Vessel is held by an individual ship owning company (each a "Vessel Owner"), which is a common corporate structure in the industry. Sobelmar Antwerp owns the Vessel Owners – Debtors SBM-1 Inc. ("SBM1"), SBM-2 Inc.

("SBM2"), SBM-3 Inc. ("SBM3"), and SBM-4, Inc. ("SBM4"), all of which are Marshall Islands corporations – through its subsidiary, Debtor Sobelmar Shipping N.V. ("Sobelmar Shipping"), a Belgium corporation.

7.      "Handysize" refers to a dry bulk vessel with deadweight (dwt) typically between 15,000 and 40,000 metric tons (a metric ton is about 2,240 pounds). Handysize is the most common dry bulk vessel and the flexibility of its design enables it to enter smaller ports, including ports that do not have their own cargo handling systems because the vessel itself is appropriately "geared" for loading and unloading cargo. The Debtors' Vessels range in size from 32,778 dwt to 35,315 dwt, and are between five and six years old. The Vessels are flagged either in Belgium or the Marshall Islands, and are generally attractive to the market due to, among other things, their fuel efficiency.

8.      As is typical in the industry for liability and insurance reasons, among others, each Vessel Owner is a single-purpose entity that charters its Vessel to an affiliate, in this case Sobelmar Shipping. Sobelmar Shipping then generates revenues by employing the Vessels on time charters and voyage charters with third parties in the maritime transportation market. Sobelmar Antwerp provides technical, commercial, and operational management of the Vessels on market terms. There is also a non-debtor affiliate entity that employs three technical superintendents who provide technical management support.

9.      The revenues from chartering all four Vessels are deposited currently in bank accounts that belong to Sobelmar Shipping held by KBC Bank N.V., a Belgian bank. HSH (defined below) does not have any contractual rights, or control, over those accounts. Sobelmar Shipping pays bareboat hire to SBM1, SBM2, and SBM4 and time-charter hire to SBM3. Those funds are used to make debt service payments, and to pay corporate fees to the Marshall Island corporate registry.

10.     On a consolidated basis, the Debtors have approximately $66.2 million in assets and $63 million in liabilities (at year end 2014).

**Description of Secured Bank Debt**

*HSH Nordbank AG*

11.     The Debtors SBM1, SBM2, and SBM3 are the borrowers pursuant to that certain Loan and Guaranty Facility Agreement with HSH Nordbank AG ("HSH"), as lender, dated June 25, 2007, with a total outstanding principal amount of $41,625,000 ("HSH Facility 1").

12.     The Debtor SBM4 is the borrower under that certain Loan and Guaranty Facility Agreement with HSH, as lender, dated December 20, 2007, with a total outstanding principal amount of $14,000,000 ("HSH Facility 2" and collectively with HSH Facility 1, the "HSH Facilities").

13.     HSH Facility 1 financed the construction and acquisition of the vessels *Brasschaat*, *Vyritsa*, and *Kovdor*, which are owned by Debtors SBM1, SBM2, and SBM3, respectively. HSH Facility 2 financed the construction and acquisition of the vessel *Zarachensk*, which is owned by Debtor SBM4. The Vessels were delivered in 2009 and 2010.

14.     Debtors Sobelmar Antwerp and Sobelmar Shipping guaranteed the HSH Facilities (the "Corporate Guarantors"). The HSH Facilities are cross-collateralized, and are secured by, among other things, first priority mortgages on each of the Vessels. The HSH Facilities are further secured by, among other things (i) assignments of earnings by the Vessel Owners, (ii) assignments of insurance by the Vessel Owners, Sobelmar Antwerp and Sobelmar Shipping; (iii) pledges of the Debtors' and Corporate Guarantors' deposit accounts held at HSH; and (iv) a cash deposit with initial balance of $1,000,000. All alleged collateral securing the HSH Facilities is referred to herein as the "Prepetition Collateral."

15.    The HSH Facilities provided funds to renew the Debtors' then fleet of three debt-free, older handysize vessels. The HSH Facilities were also secured initially by assignments of earnings and insurance associated with the formerly existing three vessels (the "Former Vessels").

16.    SBM1, SBM2 and SBM3 each borrowed $20,600,000 upon delivery of their respective Vessels under HSH Facility 1. SBM4 borrowed $21,000,000 upon the delivery of its Vessel under HSH Facility 2.  The maturity dates for loans under the HSH Facilities are eight years after delivery of the relevant Vessel.

17.    The HSH Facilities provide that the loans shall be paid in 32 quarterly installments of principal and interest ending with a balloon payment. SBM1, SBM2 and SBM3 have been paying a margin of 1.5% per annum since origination of the HSH Facilities. SBM4 originally paid a margin of 1.65% per annum; however, that margin was increased to 2.9% per annum in 2011.

18.    SBM1, SBM2 and SBM3 have each been making annual debt service payments totaling $1,200,000 and SBM4 has been making annual debt service payments totaling $1,400,000 for a total of $5,000,000 per annum in quarterly installments. The Debtors considered this repayment profile healthy, sustainable and fair to all parties.

19.    In addition to the quarterly installments described above, HSH Facility 1 required each Debtor to repay $3,000,000 within one year of the delivery of each Vessel to SBM1, SBM2 and SBM3, or in case of sale of any Former Vessel, but in any case by November 2010. It was envisaged to secure each Debtor's payment obligation by selling a Former Vessel. Following the sale of each Former Vessel, the Debtors were required to make an extraordinary principal payment in the amount of $3,000,000 for a total of $9,000,000 in extraordinary principal

payments. Each of these repayment obligations are referred to as the "Scrap Tranche" because the payment amounts were calculated using the scrap value of each of the Collateral Vessels.

20.    The Debtors sold the first Former Vessel, as required under HSH Facility 1 in March 2009. However, freight markets were depressed at that time and the Former Vessels had lost considerable market value since origination of the HSH Facilities in 2007.

21.    In order to strengthen the Debtors' overall long-term repayment capacity, Sobelmar Antwerp proposed lifting the Debtors' obligation to repay the remaining Scrap Tranches in 2010 in order not to sell the remaining two Former Vessels so that the combined fleet of four (4) new Vessels and two (2) Former Vessels would be able to support debt service payments under the HSH Facilities. The Debtors also proposed that (a) the Scrap Tranche maturity dates be extended to the maturity dates of the other loans associated with each Vessel, and (b) the Debtors would make voluntary prepayments if they had sufficient cash reserves.

22.    HSH declined the Debtors' proposal. In retrospect that decision was a mistake because the additional income from the two remaining debt-free Former Vessels would have generated enough additional cash flow to repay the Scrap Tranches. The Debtors also would have accumulated sufficient cash reserves to make debt service payments on the other tranches under the HSH Facilities much easier.

23.    After selling the first Former Vessel, the Debtors repaid the first Scrap Tranche as required under HSH Facility 1. Then, after HSH refused the Debtors' proposal, the Debtors sold the second Former Vessel for $6,000,000. The Debtors wanted to use a portion of the sale proceeds to repay the second Scrap Tranche and deposited $3,000,000 in accounts held at HSH for that purpose. The Debtors then informed HSH that they had entered into a Memorandum of Agreement for the sale of the third Former Vessel for $5,100,000.

24.    Upon realizing that the Debtors were able to sell the remaining two Former Vessels at prices well in excess of their scrap value, HSH proposed a modification of HSH Facility 1 that would delay repayment of the two outstanding Scrap Tranches.

25.    Specifically, HSH proposed that the Debtors sell the two remaining Former Vessels and deposit the $6,000,000 owed under the remaining two Scrap Tranches on the previously mentioned account with a balance of $1,000,000 and to rename the same to debt service reserve account (the "DSRA"). Under the HSH proposal, the Debtors could access the funds deposited in the DSRA if fleet earnings were not sufficient to cover debt service payments required under the HSH Facilities. HSH also proposed cross-collateralization of the HSH Facilities (HSH Facility 1 and HSH Facility 2 had not been cross-collateralized previously).

26.    The proposed modification would benefit HSH in several ways. First, cross-collateralizing the HSH Facilities would permit HSH to allocate less equity to the HSH Facilities, improving the bank's severely stressed equity ratio. Second, HSH needed US dollars urgently and was having difficulty obtaining sufficient amounts in the capital markets. Finally, postponing the Scrap Tranches' repayment dates meant that HSH would earn additional interest.

27.    The Debtors resisted the HSH proposal for several reasons. First, depositing proceeds from the second Former Vessel sale in the DSRA instead of repaying the Scrap Tranches would be a constant burden for the cash flow of the company. While the deposits held in the DSRA would not earn any interest for the Debtors, the Debtors would be required to pay interest on the unpaid Scrap Tranches. Secondly, the Debtors argued that it is more sustainable to keep the debt-free assets which improve the debt servicing capacity instead of turning these assets into liquidity while maintaining the obligation to repay the Scrap Tranches.

28.    HSH did not accept the Debtors' concerns and the Debtors were therefore forced to accept the proposal. HSH stressed that Scrap Tranche maturity dates could be extended

anytime the Debtors needed additional time. It bears noting that, in 2009, the freight markets were under severe pressure, and it was unclear when the Debtors' revenues would rebound sufficiently to repay the Scrap Tranches.

29.     One reason the Debtors relented and accepted the HSH proposal was that HSH and the Debtors both considered the $6,000,000 outstanding under the Scrap Tranches relatively minor when compared to the $70,000,000 then outstanding under the HSH Facilities. Also, based on past conduct, the Debtors believed that the parties would reach a mutually agreeable solution. The Debtors believed that HSH – as the world's largest ship financier – would continue honoring the "gentlemen's agreement" and continue extending Scrap Tranche maturity dates as needed. For the next three years HSH did so, prolonging the Scrap Tranche maturity dates twice.

30.     During 2012, due to further market deterioration, the Debtors anticipated that they would experience liquidity shortfalls. With that in mind, the Debtors approached HSH in autumn 2012 and requested (a) further extension of the Scrap Tranche maturity dates as was consistent with ongoing "gentlemen's agreements", (b) deferral of debt service for one year and (c) a one year extension of all other maturity dates under the HSH Facilities. HSH did not respond to the Debtors' proposal for many months.

31.     In Spring 2013, the freight markets continued deteriorating and the Debtors' cash reserves dwindled. Having heard nothing from HSH, the Debtors began accessing funds credited to the DSRA. HSH seemed to be withholding the anticipated extension of the Scrap Tranche maturity dates in order to cause a default under the HSH Facilities.

32.     Finally, in Fall 2013, HSH informed the Debtors that it had launched a new investment product, bundling vessels and related debt and then selling them to investors. HSH also published a press release on April 22, 2013 on its website describing the new product. The

press release named Navios, a Greek company, as the first buyer of the new HSH product (the "HSH-Navios Platform").

33.    On December 10, 2013 HSH representatives informed the Debtors, during an in-person meeting in Antwerp, Belgium, that HSH would like to include the Debtors' Vessels in a bundled investment product. The HSH representatives advised that the Vessels were attractive due to their young age and their relative energy efficiency. Furthermore, the HSH representatives advised that HSH needed the Vessels because they could be packaged with less attractive vessels in order to achieve an average quality acceptable to investors. HSH referred to the Vessels as "pearls" in this meeting. References to the HSH-Navios-Platform were made occasionally even earlier, unfortunately it is difficult to reconstruct on which dates.

34.    In the following months HSH remained uncooperative. As market conditions improved, HSH begrudgingly agreed to negotiate a restructuring of the HSH Facilities. However, HSH proposed terms that were technically unviable and unsustainable. HSH stated that they do not want a restructuring in which they would deteriorate their existing position meaning they want to be able to terminate the loan anytime despite having a restructuring agreement. HSH rejected proposals by the Debtors' outside consultants, and appeared uninterested in restructuring the HSH Facilities. HSH eventually ended restructuring discussions.

35.    On October 1, 2014, HSH demanded repayment of the Scrap Tranches. Having reviewed numerous reports by the Debtors' outside consultants, HSH knew the Debtors would be unable to repay the Scrap Tranches at that time. HSH extended the Scrap Tranche payment deadlines several times during the succeeding months.

36.    In a telephone conference on November 7, 2014, HSH presented an ultimatum. The Debtors could include their fleet of Vessels in a product similar to the HSH-Navios Platform

and use HSH as broker in that transaction, or HSH would enforce its mortgages on the Vessels. Documents of the new "Bergamo-Platform" were provided to the Debtors subsequently.

37.     The Debtors rejected the HSH ultimatum for several reasons. First, the Debtors believed that HSH was acting in violation of German banking law. Also, in the meantime, the Debtors learned that HSH and Navios had agreed HSH would receive a certain percentage of any net profits Navios received upon liquidating the HSH-Navios Platform. In other words, HSH and Navios would effectively expropriate all value associated with the vessels included in HSH-Navios Platform from the vessel owners

38.     In addition, the vessel owners that included their vessels and loans in the HSH-Navios Platform were different from the Debtors. Those vessel owners were "KG-owners", meaning that they held their vessels through a tax-advantaged limited partnership of natural persons (*kommanditgesellschaften*) (a "KG-company"). While the KG-owners were basically investors (doctors, lawyers and so forth), the Debtors are true commercial, technical and operational vessel owners. One consequence of that distinction is that the KG-owners, unlike the Debtors, could be required to return payments received from the KG-company in an insolvency proceeding. Therefore the KG-owners presumably agreed to provide their vessels to the HSH-Navios Platform in order to avoid insolvency, and also to avoid an unwinding of the German tax benefits associated with the KG-company structure.

39.     During the restructuring negotiations, the Debtors continued to make debt service payments required under the HSH Facilities. The original repayment plan, agreed in 2007, proved to be viable despite huge turmoil in shipping and freight markets. Still, HSH again demanded full repayment of the Scrap Tranches on December 15, 2014.

40.     Nevertheless, on December 22, 2014, HSH terminated HSH Facility 1 and demanded immediate repayment of the outstanding principal amount, $41,625,000, plus

breakage costs, interest and default interest calculated with an exceptionally high interest rate.

HSH asserted that the only reason it terminated HSH Facility 1 was non-payment of both Scrap

Tranches. With no advance notice, HSH sent Sobelmar Antwerp and Sobelmar Shipping (both

guarantors under the HSH Facilities) letters dated January 12, 2015 demanding repayment of

HSH Facility 1.

41.    Right after reception of the termination notice, the Debtors' German counsel

contacted Bracewell & Giuliani LLP's Connecticut office to assist with contingency planning.

While the Debtors remained hopeful of reaching an out-of-court agreement with HSH, they

considered it prudent to investigate other possibilities. The Debtors contacted specialist Belgian

and German counsel for the same reason. The Debtors formalized their engagement of Bracewell

on January 9, 2015 and shortly thereafter transferred a total of $260,000 to Bracewell's Hartford

account as a fee retainer,[1] which was paid on behalf of and for the benefit of all six Debtors in

accordance with the terms of Bracewell's engagement letter. The first phase of the Bracewell

engagement involved an initial assessment of the situation with the Debtors and their German

counsel. The second phase involved both assistance with lender negotiations to the extent

required and contingency planning for chapter 11 filings in the event those negotiations were

unsuccessful.

42.    On January 26, 2015, during an in-person meeting in Hamburg, HSH again

insisted the Debtors repay $6,000,000 owed under the Scrap Tranches. The parties also spent

considerable time discussing whether termination of HSH Facility 1 was consistent with German

law in light of the bank's conduct during restructuring negotiations on the basis of principles of

---

[1] The Debtors transferred a total of $345,000 to Bracewell's Hartford account. Of that amount, (i) $260,000 was
paid as a fee retainer to Bracewell on behalf of and for the benefit of each Debtor, (ii) $25,000 was paid as a fee
retainer for Odinbrook Global Advisors LLC, the Debtors' proposed financial advisor, on behalf of and for the
benefit of each Debtor; and (iii) $10,000 belonging to each Debtor (for a total of $60,000) was transferred to
Bracewell for the purposes of opening debtor in possession bank accounts.

good faith. No meaningful discussions occurred after that meeting. On February 13, 2015 the Debtors refused the validity of the termination while the Corporate Guarantors refused the demand under the relevant guarantees.

43.     Because, at any particular time, the Debtors' primary assets – the Vessels – are in international waters or foreign ports, there is no single logical location for an insolvency filing. After investigating the possibility of filings in Belgium and Germany, the Debtors concluded that the United States provided the most meaningful opportunity due to, among other reasons, the extraterritorial reach of the automatic stay and the practical enforceability of the stay against creditors such as HSH with business operations in the United States. The Debtors were also aware of the commencement of chapter 11 cases by numerous other international maritime transportation companies for similar reasons, including recent filings by Taiwan-based TMT Shipping (Houston), Athens-based Excel Maritime (New York), Bermuda-based Nautilus Shipping (New York), Athens-based Omega Navigation (Houston), and Amsterdam-based Marco Polo Seatrade (New York).

44.     Once it became apparent that an out-of-court agreement could not be reached with HSH, the Debtors made the decision and instructed Bracewell on March 17, 2015 to commence these chapter 11 cases.

*KBC Bank N.V.*

45.     KBC Bank N.V. ("KBC") has provided financing to Sobelmar Antwerp under various loans since its incorporation in 1995. In 2007, KBC provided Sobelmar Antwerp a working capital loan over €3,050,000, which has currently a total outstanding principal amount of €2,484,778 (the "KBC Loan"). The KBC Loan is secured by mortgages on three pieces of real estate that Sobelmar Antwerp owns. As additional collateral, I granted mortgages on a piece of undeveloped land that I own personally, and on my home. The value of the collateral securing

the KBC Loan exceeds the outstanding principal amount. Sobelmar Antwerp repays each year a portion of the KBC Loan amounting to €200,000 with monthly principal and monthly interest payments. The remaining part of the KBC Loan receives semi-annually interest payments. Furthermore, Sobelmar Antwerp, KBC and I have agreed in principle that Sobelmar Antwerp will sell two pieces of real estate (both are unused office facilities), that I will sell the undeveloped land that I own personally, and that the proceeds of those sales will be used to repay the KBC Loan.[2]

**Description of Unsecured Debt**

*Wingol Chartering Ltd.*

46.     Wingol Chartering Ltd. ("Wingol") is a British Virgin Islands ship chartering company. In 2007, Wingol extended a $5,000,000 loan to non-debtor affiliate Koma Shipping Ltd. ("Koma"), a Malta company, for the purpose of financing the equity installments associated with building the Vessels (the "Wingol Loan").

47.     The Wingol Loan was originally secured by one of the Former Vessels. However, the Wingol Loan became unsecured when that vessel was sold due to HSH's insistence to repay the respective Scrap Tranche not later than November 2010.

48.     By August 2008 the Debtors had paid back $4,000,000 under the Wingol Loan and only $1,000,000 remained as principal. However, Sobelmar Antwerp subsequently borrowed an additional $2,000,000 from Wingol in 2009 due to HSH's refusal to defer the repayment of the Scrap Tranches while insisting to deposit $6,000,000 on the DSRA held with HSH. The redrawing amount from Wingol was used to maintain the Vessels and for working capital

---

[2] On December 9, 2014, Sobelmar Antwerp and a buyer signed a Memorandum of Agreement for the sale of one of the pieces of real estate (an unused office facility) mortgaged to KBC. The Debtors will likely seek approval of the contemplated sale under Bankruptcy Code §363 shortly.

purposes of the Debtors. As of the Petition Date, the total outstanding principal amount under the Wingol Loan remains at $3,000,000 plus overdue interests.

49.    Sobelmar Antwerp has not made any interest payments to Wingol since November 2013 because HSH made cessation of interest payments on the Wingol Loan a condition to restructuring negotiations.

*Trade Debt*

50.    The Debtors' remaining unsecured debt is primarily trade debt. As of the Petition Date, the Debtors estimate their unsecured trade debt totals $455,439. As described in more detail below, the Debtors have identified certain trade creditors as critical vendors.

### III.  EVENTS LEADING TO CHAPTER 11 FILING

51.    The shipping industry is highly cyclical, with attendant volatility in charter hire rates and profitability. Following record charter rate levels in 2007 and 2008, charter rates in many sectors of shipping quickly plummeted to decade-low levels as a result of the global recession. As described above, in the years leading up to the global recession, the Debtors were in process of renewing their aging fleet. After taking possession of the four new Vessels, the Debtors faced increasing liquidity pressure but continued servicing their debt and meeting operating expenses.

52.    Realizing the need to restructure their bank debt obligations, the Debtors hired outside consultants and engaged in good faith restructuring negotiations with its lenders. Unfortunately, and despite the beginnings of rising charter rates, the parties were unable to come to terms despite several attempts at a consensual deal. During the course of negotiations, it became apparent that the Debtors' primary lender, HSH, was intent on including the Debtors' Vessels in a bundled investment product rather than in restructuring the HSH Facilities. In order

to preserve its assets and maximize value for all stakeholders, the Debtors filed for chapter 11 protection.

## IV.  FIRST DAY MOTIONS

**Motion for an Order (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Adequate Protection for the Use Thereof, and (iii) Scheduling a Final Hearing**

53.    As a consequence of the prepetition secured financing, certain cash in the Debtors' possession or in which the Debtors have an interest on and after the Petition Date may constitute asserted cash collateral ("Cash Collateral") in which HSH may assert an interest within the meaning of § 363(a) of the Bankruptcy Code.

54.    The Debtors have an urgent need for the immediate use of the Cash Collateral. Without access to Cash Collateral, the Debtors will be unable to meet basic operating expenses, imperiling the survival of their business. In particular, HSH currently approves and releases all electronic funds transfer requests in connection with certain of the Debtors' bank accounts. Prior the Petition Date, HSH refused to approve and release electronic funds transfer requests the Debtors' initiated to pay crew wages in a timely manner, imperiling the Debtors businesses and Vessel safety and potentially breaching applicable laws as to employee payments. While HSH did eventually approve the electronic funds transfer and release crew wage payments, the bank's willingness to interfere with the Debtors' access to cash flows even at the expense of Vessel safety underscores the Debtors' urgent need for uninterrupted access to Cash Collateral.

55.    The operation of the Debtors' vessels is capital intensive, and any lapse in operation, no matter how transitory, could have a substantial adverse effect on the going concern value of the Debtors' business. For example, the Debtors incur ongoing operating expenses related to navigating vessels, which costs include crew costs, provisions, deck and engine stores, lubricating oils, insurance, maintenance and repairs, fuel (termed "bunkers" in the industry), port

expenses, etc. Absent the use of Cash Collateral, these expenses cannot be met and the sole income producing assets of the Debtor – the Vessels – will be unable to operate and could possibly be subject to maritime liens and the threat of arrest in international ports.

56.     Accordingly, the Debtors face "immediate and irreparable harm to the estate" absent the emergency consideration of the relief requested in this motion. The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, postpetition operating expenses, as well as any court approved prepetition expenses that may be at issue. Without authority to use Cash Collateral, the Debtors will not be able to function as a going concern, and will not be able to proceed to consideration of a plan of reorganization. Accordingly, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses, and will be in the best interests of the Debtors, their estates and their creditors.

57.     The Debtors intend to provide adequate protection, to the extent of the aggregate decrease in value of Cash Collateral from and after the Petition Date and to the extent of HSH's interest therein, by: (i) maintaining the value of HSH's asserted interest in the Cash Collateral by continuing to operate the business and thereby generating new cash; (ii) granting HSH postpetition replacement liens pursuant to Bankruptcy Code § 361(2) in accounts receivable, including cash generated or received by the Debtors subsequent to the Petition Date, but only to the extent that the HSH had valid, perfected prepetition liens and security interests in such collateral as of the Petition Date; and (iii) providing HSH a superpriority claim pursuant to Bankruptcy Code § 507(b) over all administrative expense claims and unsecured claims, of any kind or nature whatsoever, whether in existence on or arising after the Petition Date subject to the Carve-Out.

58.     The Debtors seek permission to use Cash Collateral solely to pay the expenses described in the expenditures contained in the budget attached to the cash collateral motion (the

"Interim Budget") for the Interim Period, solely up to the amounts, at the times and for the purposes identified in the Interim Budget. The Debtors shall not, without the prior written consent of HSH or Court order, use Cash Collateral with respect to any single week in the Interim Budget in an amount in excess of the aggregate amount budgeted for that week, provided, however, that there shall be a permitted variance of 20% in the aggregate for any amounts listed in the Interim Budget for a particular week. Notwithstanding the foregoing, for exceptional, unanticipated expenditures that are not contemplated by the Interim Budget, the Debtors and HSH may agree that such expenditures, if approved by the relevant Prepetition Bank Lenders, are not credited against the permitted aggregate variance. Any amounts listed in the Interim Budget that are unused in any week may be carried over and used by the Debtors in any subsequent week and any unused amounts may be utilized for any other line item within the week or a subsequent week or weeks. Further and without limiting the foregoing, in the case of professionals' fees set forth in the Interim Budget that are unused in any week, such unused amounts may also be applied to prior week periods where such amounts exceeded the line item for such week.

59. The Interim Budget reflects weekly cash reserve amounts associated with certain items that are paid less frequently, with the intention that reserved cash will be carried forward and used to pay such items when they become due, as permitted under the proposed Interim Budget.

**Motion for an Order (i) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Foreign Vendors, Service Providers and Governments and Certain Critical Vendors, and (ii) Authorizing Financial Institutions to Honor all Related Checks and Electronic Payment Requests**

60. In their ordinary course of business, the Debtors rely on the Critical Vendors to supply goods, materials and services without which the Debtors' business either could not

17

operate or would operate at significantly reduced profitability. The Critical Vendors provide the

Debtors with the following categories of goods and services:

(a)     Agents' Expenses and Costs. Agents provide the crew with assistance in joining/signing off of the Vessels, including travel expenses. Moreover, they arrange for necessary ship provisions and repairs, and organize the supply, transport and the handling of goods. It is essential that the agents are paid so as not to disturb the smooth operations of the Vessels worldwide.

(b)     Port Expenses. Numerous port expenses are accrued by the Vessels as they conduct their business throughout the world. Pilotage, docking masters, towage, mooring, tugs, harbor dues, tonnage dues, etc. are incurred in ports throughout the world. It is essential that such foreign debts be paid in order to ensure the Vessels can continue to conduct business in foreign ports of call.

(c)     Lubes. Lube oil is crucial to the operation of the engine and most other mechanical functions on board the Vessels. The Debtors obtain lube oil through long-term relationships that offer significant volume discounts. Any disruption to those relationships could have adverse economic consequences.

(d)     Crew Costs. Like most international shipping companies, the Debtors retain third party agents that employ and compensate the mostly foreign born highly skilled crew that work on their Vessels. The Debtors cannot risk any impairment to their relationship with these foreign third party manning agents or crews.

(e)     Cabin, Deck and Engine Stores and Spares. Stores consist of materials necessary to keep the Vessels operating. This may include communication systems, engineer's tools, chemicals, gases, spare parts, paints, safety equipment, cloth and linen products, rigging equipment, etc. Stores are often supplied by foreign vendors in close physical proximity to the Vessels. Stores are of a specialized nature, which makes it imperative that relationships with these vendors are maintained.

(f)     Bunkers. Bunker fuel is liquid fuel which powers the Debtors' Vessels. Bunker fuel is provided by local vendors in the applicable port at the time because it is necessary for such vendors to be in close physical proximity to the Vessels. It is essential to the locomotion of the Vessels that the Debtors maintain healthy relationships with those vendors who provide them with bunker fuel.

(g)     Maintenance and Repair. It is essential that the Vessels (e.g. engines, decks, hulls, communications equipment, radar, etc.) be maintained and repaired for safe and efficient operation. Vendors providing these services

are typically foreign, as close physical proximity to the Vessels is required.

(h)     Safety and Quality. The Vessels' machinery is on a continuous survey inspection to ensure safe operating conditions. Likewise, the Vessels continuously maintain and add safety equipment to meet governmental and certification bureau standards. In order to assure the quality of the Vessels and the safety of the crew and others, it is necessary to satisfy those vendors who provide services and goods related to safety and quality of the Vessels.

61.     The Debtors believe that the payment of the Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in various instances, the Critical Vendors are the only source or the most preferred source from which the Debtors can procure certain goods and services within a timeframe and at a price that will permit the Debtors to continue to smoothly operate their businesses. A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtors postpetition and may force the Debtors to obtain such goods and services elsewhere at a much higher price or in a quantity or quality that is insufficient to satisfy the Debtors' requirements. This could, in turn, diminish the value of HSH's asserted interests and the recoveries available to other creditors.

62.     A vendor may be the exclusive or preferred supplier of products or services to the Debtors for a number of reasons. In some cases, it may be the case that the only way that the Debtors are able to purchase products or services in quantities of the desired amount is through a particular vendor in a particular port. For example, the Vessels require highly specialized replacement parts, and there are simply not many vendors in the world that can deliver those parts reliably, safely and on time. It is vital for the charterers of the Vessels to arrive and leave ports on time in order to meet their shipping obligations. In other cases, the Debtors have an established relationship with one vendor, and there is simply no available supply from any other vendor or the time and expense of getting another vendor "up to speed" with the Vessels and

needs is not cost effective. In other instances, due to preferred pricing from existing business relationships, procuring a particular supply of a certain product from an alternative source would be too expensive.

63.      The timing of a vendor's supply may also render it a Critical Vendor. The Debtors are involved in a highly transactional and capital intensive business. As a result, the Debtors are highly dependent on their ability to order and receive materials from vendors in a particular timeframe. Current Critical Vendors are familiar with the Vessels and if, for example, a replacement part or specialized lube is needed at any port which the Vessels frequent, the current Critical Vendors can deliver the right product. All four of the Vessels are compensated at day rates, so any loss of time would directly result in financial losses.

64.      The Debtors believe that, absent the ability to pay certain prepetition amounts owed to Critical Vendors, the Debtors' access to necessary goods and services would be extinguished as the Critical Vendors will refuse to continue doing business with the Debtors or may only do business if the Debtors provide trade term accommodations such as advance deposits or payment prior to delivery.

65.      Most importantly, and unique to maritime insolvency cases such as these cases, the Critical Vendors supply the Debtors' Vessels with goods or services that could arguably be considered "necessaries," which is a relatively universal legal concept under the maritime laws of the many jurisdictions in which the Debtors' Vessels incur obligations.[3] Creditors alleging claims for necessaries under maritime law are typically entitled to assert an *in rem* claim against the Debtors' Vessels, in addition to an *in personam* claim against the Debtor itself. Maritime

---

[3] The Debtors make no admission as to the nature of any claim or lien against any Vessels based on necessaries, and reserve all rights with regard to same.

liens are "secret liens" in that a lien claimant need not take any steps to attach or perfect its lien. A lien claimant can typically arrest a vessel in any port in which the vessel is found.

66.     While I understand that the automatic stay is likely to provide protection from such attachment and arrest with regard to American vendors, there is no guarantee that international companies outside this Court's jurisdiction will respect the power of 11 U.S.C. § 362, especially as the Vessels enter far flung foreign ports all over the world. Some of these jurisdictions may eventually recognize the automatic stay of United States bankruptcy law, but only after considerable delay and considerable effort on the part of the Debtors, all the while the Debtors could be losing day rate fees, as well as their reputation for timely delivering cargo. Of course, other jurisdictions are unlikely to ever recognize United States bankruptcy law.

67.     Since the Critical Vendors may arguably be secured creditors and may have the ability to arrest the Debtors' Vessels in foreign ports around the world, it is in the best interests of all parties to satisfy the Critical Vendor Claims of foreign vendors as described herein.

**Motion for Entry of an Order Authorizing Maintenance of Insurance Policies and Payment of Insurance Premiums**

68.     In connection with the operation of their business, the Debtors maintain various insurance policies (the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers").

69.     As required by their lenders, international classification societies and various local ports, the Debtors carry insurance to protect them against most of the accident-related risks involved in the conduct of their business. The operation of any Vessel includes risks such as mechanical failure, collision, property loss, cargo loss or damage, and business interruption due to political circumstances in foreign countries, hostilities and labor strikes. Additionally, there is an inherent possibility of marine disaster, including spills and other environmental mishaps, and

the liabilities arising from owning and operating vessels in international trade. To safeguard against these risks, the Debtors' Insurance Programs include coverage for (i) protection and indemnity ("P&I"); and (ii) marine hull, machinery, gear and equipment ("Hull & Machinery"). The Debtors also carry automobile, civil liability, workplace accident, fire, and small risk insurance coverage

70.    The Debtors' P&I insurance generally provides coverage against loss, damage, liability or expense, including liabilities in respect of wreck removal, injury or death of crew, passengers and other third parties, and the loss or damage to cargo, incurred by the insured with respect to the insured's interest in a vessel and in connection with the operation of the owned vessel during the effective terms of the policies.

71.    The Debtors' Hull & Machinery policies provide coverage against damages or total loss of the vessel caused, among other things, by perils of the sea, fire, explosion, and liabilities resulting from a collision.

72.    The premiums the Debtors are required to pay for each of the foregoing policies are payable in installments. Premiums are paid either directly to the Insurance Carrier or through a broker who then pays the pertinent Insurance Carrier. As of the Petition Date, the Debtors do not owe outstanding premium installment payments for these policies. The Insurance Programs are essential to the preservation of the Debtors' business, property and assets and, in certain instances, such coverage is required by various regulations, laws, loan agreements and the contracts that govern the Debtors' maritime and commercial activity.

73.    The Debtors seek authorization to (i) maintain and continue to make payments with respect to the Insurance Programs on an uninterrupted basis, and (ii) pay all prepetition premiums, deductibles, and other amounts due under the Insurance Programs, including any applicable retrospective adjustments. The Debtors also propose to continue making all

postpetition payments in connection with the Insurance Programs. The Debtors propose to pay all obligations arising under, or related to, these programs and policies subsequent to the Petition Date in the ordinary course of business, not on an accelerated basis, and in accordance with the terms of these programs and policies. To the extent a premium or deductible reimbursement relating to a period prior to the Petition Date is outstanding with respect to any insurance policy, the Debtors seek authority to make such payment in the same manner that such payments were made prior to the Petition Date.

74.    The Debtors further request that the Court authorize and direct those banks at which the Debtors maintain accounts to receive, process, honor and pay any and all checks drawn or electronic funds transferred to pay any obligations arising under the Insurance Programs (the "Insurance Obligations"), whether such checks were presented prior to or after the Petition Date; *provided, however*, that such checks or electronic transfers are identified by the Debtors as relating directly to the authorized payment of the Insurance Obligations. The Debtors also seek authority to issue new postpetition checks, or effect new electronic fund transfers, on account of the Insurance Obligations to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

**Motion for an Order (i) Authorizing Continued Use of Existing Business Forms and Records, (ii) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System, and (iii) Waiving the Requirements of Bankruptcy Code § 345(b)**

75.    Prior to commencing these cases, in the ordinary course of their businesses, the Debtors used a cash management system (the "Cash Management System") to efficiently collect, transfer, and disburse funds generated by their business operations.

76.    The Debtors respectfully request authority to maintain their bank accounts and the Cash Management System in accordance with their usual and customary practices to ensure a

smooth transition into chapter 11 with minimal disruption to operations and, in connection therewith, seek a waiver of the requirements of Bankruptcy Code § 345(b). The Debtors also request authority to close any of their bank accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

77.    In order to conduct their postpetition business, the Debtors need to be able to issue checks to vendors, service providers, and others. Additionally, their bank accounts are maintained with financial institutions that are financially stable.

78.    To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' business and a delay in receipt of funds needed for the Debtors' operations.

79.    The Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' reorganization efforts.

80.    The relief requested in this motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System, as modified, will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

81.    The Debtors seek a waiver of the Guidelines' requirement that they open a new set of books and records as of the Petition Date. Opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. The Debtors, in the ordinary course of their business, use

many invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtors are engaged and the numerous other parties with whom they deal, the Debtors need to use their existing business forms without alteration or change. Printing new business forms would take an undue amount of time and expense. Accordingly, the Debtors respectfully request that they be authorized to continue to use their existing business forms and to maintain their existing business records.

82.     Additionally, certain banks charge monthly fees to the Debtors for maintaining their bank accounts, which may vary monthly based on actual usage. The fees are assessed according to the kind of transaction. The Debtors were current on payment of these monthly fees as of the Petition Date. The Debtors request authority to continue paying the monthly fees in the ordinary course of business, including any portion of the fee attributable to prepetition services.

**Motion for the Entry of an Order Pursuant to Bankruptcy Code §§ 105(a), 362 and 365 Enforcing and Restating Automatic Stay and Ipso Facto Provisions**

83.     The Debtors' business operations are conducted worldwide with significant assets moving through international waters at any given time. As a result, the Debtors have many foreign creditors and counterparties to contracts who may not be well versed in the restrictions of the Bankruptcy Code. Many of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor in possession's authority to conduct its business. These creditors may be unfamiliar with the operation of the automatic stay and other provisions of the Bankruptcy Code.

84.     Thus, various interested parties may attempt to seize assets located outside of the United States to the detriment of the Debtors, their estates and creditors, or take other actions in contravention of the automatic stay of Bankruptcy Code § 362. In addition, upon learning of the Debtors' bankruptcy, counterparties to leases and executory contracts may attempt to terminate

those leases or contracts pursuant to *ipso facto* provisions in contravention of Bankruptcy Code §
365.

85.     In particular, the Debtors learned that, prior to the Petition Date, HSH contacted
certain of the Debtors' charter counterparties without the Debtors' knowledge, seeking to seize
cash charter revenues otherwise payable to Sobelmar Shipping. The Debtors are concerned that,
without an order explicitly barring such conduct, HSH might continue trying to enforce alleged
collateral rights in violation of the automatic stay.

86.     Notwithstanding the fundamental nature of the automatic stay and *ipso facto*
protections, and the fact that they arise as a matter of law upon the commencement of a chapter
11 case, not all parties affected or potentially affected by the commencement of a chapter 11 case
are aware of the aforementioned Bankruptcy Code provisions. Nor are all parties cognizant of
the significance and impact of these provisions. Experience has shown that it is often necessary
to advise third parties of the existence and effect of the automatic stay and the invalidation of
*ipso facto* provisions, particularly in cases in which the debtor conducts significant business in
foreign jurisdictions. Occasionally, it is necessary to commence proceedings in the bankruptcy
court to enforce these provisions. Accordingly, it is not uncommon for a bankruptcy court to
issue an order embodying and restating the provisions of Bankruptcy Code §§ 362 and 365.

87.     Accordingly, the Debtors seek entry of an order, pursuant to Bankruptcy Code §§
105(a), 362 and 365, enforcing and restating the automatic stay and *ipso facto* provisions of the
Bankruptcy Code. The Debtors intent is that a specific and explicit order from this Court will
protect the Debtors from improper actions, but also actions from other unwitting parties in
foreign jurisdictions who are not familiar with the Bankruptcy Code or its protections and who
might otherwise violate those sections.

**Motion Pursuant to Bankruptcy Rule 1015 Requesting Joint Administration of Chapter 11 Cases**

88.     The Debtors anticipate that, during the course of these cases, it will be necessary to file numerous motions and applications, as well as other pleadings and documents, seeking relief on behalf of all Debtors. To accomplish this as efficiently and cost-effectively as possible, the Debtors seek joint administration of their cases under the Sobelmar Antwerp N.V. case. The Debtors respectfully submit that joint administration of their chapter 11 cases is in the best interests of their estates, creditors, and other parties-in-interest; and will further the interests of judicial economy and administrative expediency by, among other things, obviating the need to: (i) file duplicate motions, (ii) enter duplicate orders, and (iii) forward unnecessary, duplicate notices and other documents to creditors and other parties-in-interest, which actions would cause the Debtors' estates to incur unnecessary costs and expenses.

**Request for Expedited Consideration of Certain "First Day" Matters**

89.     Expedited consideration of the First Day Matters is critical to the maintenance of the Debtors' estates. The Debtors presently lack sufficient liquidity to support their operations. In fact, the Debtors have almost no cash with which to operate. The Debtors need expedited consideration of the First Day Matters in order to meet payroll and other current operating expenses, including, without limitation, insurance, fuel, docking fees, maintenance, lease, and employee obligations. Without expedited consideration of the First Day Matters, the value of the Debtors' assets could be negatively affected.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 17th day of March, 2015.

_____
Vladimir Terechtchenko

#4809808