**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

---------------------------------------------------------X
                                              )
**In re**                                   )         **Chapter 11**
                                              )
**SOBELMAR ANTWERP N.V., et al.**[1]    )         **Jointly Administered Under**
                                              )         **Case No. 15-20423 (AMN)**
                    **Debtors.**          )
---------------------------------------------------------X

**OBJECTION OF HSH NORDBANK AG TO**
**AGREED MOTION TO ASSUME CHARTER AGREEMENTS**
**WITH POLA MARITIME LTD.**

Secured creditor, HSH Nordbank AG ("HSH"), by and through its counsel, hereby objects to the Agreed Motion to Assume Charter Agreements with Pola Maritime Ltd. (the "Motion"), Docket No. 51, filed by Sobelmar Antwerp N.V. and its debtor affiliates in this case (the "Debtors").

**I.    INTRODUCTION**

1. Debtors filed their Chapter 11 petition on March 17, 2015 (the "Petition Date"). On or about April 7, 2015, the Debtors filed the Motion to assume four charter agreements with Pola Maritime Ltd. ("Pola" or the "Charterer").

2. Debtors own a total of four vessels (the "Vessels"), all of which are mortgaged to HSH. In addition to the first priority mortgages, HSH holds an assignment of the charter contracts between the Charterer and Debtors and an assignment of the earnings paid by the

---

[1] Case No. 15-20423 – Sobelmar Antwerp N.V., Case No. 15-20424 – Sobelmar Shipping N.V, Case No. 15-20425 – SBM-1 Inc., Case No. 15-20426 – SBM-2, Inc., Case No. 15-20427 – SBM-3 Inc., Case No. 15-20428 – SBM-4

- 1 -

Charterer to the Debtors. The funds paid by the charterer (or renter) to the owner of a vessel are known as "earnings" "charter hire" or "hire" ("Hire").

3. The Debtors have no source of income other than the Hire paid by the Charterer. (Decl. of John G. Kissane in Support of Objection ¶ 4 ("Kissane Decl."))[2]. In these circumstances, where the Hire makes up all of the Debtors' income, the motion of the Debtors to assume the Charters is premature, not sufficiently supported by the record which includes no financial analysis, and is being filed for the sole purpose of prejudicing the interest of HSH and other creditors.

## II.    RELIEF REQUESTED

4. HSH requests that the Court deny Debtors' Motion to Assume the Charters pursuant to Bankruptcy Code § 365(a) as premature and not properly supported by financial analysis.

5. The assumption of the Charters is, in essence, a poison pill for a conversion to a Chapter 7 or any plan of reorganization not including the Charters. If the Debtors assume the three-year Charters any plan or reorganization that does not include the Charters would be prohibitively expensive to the Estate. After assumption any termination of the Charters would allow the Charterer to claim for breach of the three-year Charters. Such a claim could be millions of dollars, particularly as charter rates are expected to rise. Charterer's claim could constitute an administrative expense having priority over other claims. The claim of Charterer

---

Inc.

[2] In the absence of a transcript of the creditors' meeting, HSH relies on the declaration of its counsel who attended the meeting. If the facts testified to at the meeting are disputed by the Debtors, HSH should be permitted adequate

80352307v1                                    - 2 -

might also be a maritime lien. By assuming the Charters now, the Debtors and Pola could be manufacturing damages that outrank other creditors in the event that the Charters are later terminated in connection with a reorganization or liquidation plan.

6. HSH also requests sufficient time to conduct discovery on the relationship between the charterer Pola, Debtors and one of Debtors' largest creditors, Wingol Chartering Ltd. and related Wingol entities.

## III. FACTS

### A. The Charter Agreements

7. Sobelmar Shipping N.V. ("Sobelmar") owns four dry cargo vessels. Sobelmar entered into three charter agreements[3] for its vessels KOVDOR, BRASSCHAAT, and ZARECHENSK on November 27, 2014, December 10, 2014 and December 19, 2014 respectively. Each of the charters was for a period of 12 months at the rate of $9,000 per day.

8. The charterer counterparty was Pola. Public information shows that Pola, like the Debtors, is "a Russian-controlled company." *Pola Shipping in Hunt for Newbuilding Bank Finance,* Tradewinds, Oct 18, 2013. During the creditors' meeting on April 15, 2015, Debtors' representative Vladimir Terechtchenko stated he did not know whether Pola was affiliated with Wingol Chartering Ltd., another Russian-controlled company which made indirect loans to Debtors' and is listed as one of Debtors' largest creditors.

9. On or about December 15, 2014, Sobelmar renegotiated the Charters, extending

---

time to otherwise document the material facts.

[3] We understand Debtors wish to keep the Charters private and will submit copies of the Charters and Addendums to the court for *in camera* review.

the term from 12 months to three years at the same rate of $9,000 per day. (Addendum No. 1 to Charters).

10. Shortly before the Petition Date, the Debtors informed Pola that they intended to file for bankruptcy protection. (Kissane Decl. ¶ 11). After so informing Pola, Sobelmar again renegotiated the Charters. This time Sobelmar agreed to a reduction in the Charter hire to be paid to Debtors from $9,000 per day to $8,000 per day after the first six months of each three-year charter. (Addendum No 2 dated March 10, 2015). This effectively reduced the amount to be paid to the Debtors' estate by $2,700,000 over the life of the Charters. It is difficult to discern the consideration for this reduction made on the eve of the Petition Date, when Pola was aware of the imminent bankruptcy filing.

11. In addition, on the same date, March 10, 2015, Sobelmar agreed to Charter its fourth and final vessel, VYRITSA, to Charterer, at an even lower rate of $6,500 per day for the first year and $8,000 per day for the final two years. This is a reduction of $1,620,000 over the term of the three-year charter from the rate of $9,000 per day originally agreed with Pola on Debtors' other vessels. (Addendum No. 2).

12. Debtors also revealed that Pola withheld approximately $500,000 in Hire due to the Debtors. Although Debtors' CEO claimed he did not know why Pola withheld the Hire, the $500,000 was paid after the Charter rates were reduced by Debtors and after the Motion to Assume the Charters was filed.

IV.  **ANALYSIS**

  A.  **Debtors' Motion to Assume the Charters is Premature**

13. The Charters at issue generate all of the Debtors' income. As such, whether or not the Debtors should assume the Charters is of vital importance not only to the Debtors, but to all the creditors. Such an action should not be taken hastily. See *In re Wheeling–Pittsburgh Steel Corp.*, 54 B.R. 385, 388 (Bankr.W.D.Pa.1985) (noting that it is "vitally important" to all parties that the debtor make a carefully considered decision whether to assume or reject an executory contract); see also *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir.1984) ("To interpret the Code so as to minimize flexibility and rush the debtor into what may be an improvident decision does not further the purposes of the reorganization provisions."); *In re Dana Corp.*, 350 B.R. 144, 147 (Bankr.S.D.N.Y.2006) ("Permitting a debtor to make its decision as late as plan confirmation enables the debtor to carefully evaluate the possible benefits and burdens of an executory contract"); *In re Penn Traffic Co.*, 524 F.3d 373, 378-79 (2d Cir. 2008)("The plain language of the Code permits a chapter 11 trustee (and, by extension through § 1107, a debtor-in-possession) to assume or reject the executory contract "at any time before the confirmation of a plan.").

14. The Debtors' Motion to Assume is not supported by any financial analysis. Indeed, the only support for Debtors' Motion is the four-page Declaration of Vladimir Terechtchenko, who opines that they are on good terms and are within market range. (Decl. of Terechtchenko ¶ 7). Mr. Terechtchenko also makes other unsupported statements, including that Chapter 11 makes the vessels more difficult to charter. He fails to provide copies of previous

charters, while stating that these new charters are on better terms and have less "off-hire" provisions.

15. More worryingly, it appears that the Motion to Assume was part of a pre-petition deal made between Pola and Debtors whereby Pola would release $500,000 in earned but unpaid charter hire if Debtors reduced the charter rates and moved to assume the Charters. The reduction in the agreed Charter rates immediately before the Petition Date by approximately $4,320,000 over the life of the Charters does not appear to be otherwise supportable. Mr. Terechtchenko testified that he did not know why Pola had withheld the $500,000 in hire. (Kissane Decl. ¶ 13).

16. It appears that Pola is related to Wingol, one of the Debtors' largest creditors. It is possible, for example, that the rate decrease was negotiated in order to "pay-off" the Wingol loan. Although Mr. Terechtchenko testified he did not know who owned Wingol, or whether Wingol was related to Pola, this assertion rang hollow considering that the loan has been outstanding since 2002 and additional funds were loaned to Debtors by Wingol in 2007. Indeed, Debtors' German legal advisor clarified at the creditors' meeting, saying he thought Pola and Wingol might be related. (Kissane Decl. ¶7). Mr. Terechtchenko also testified that Wingol never served as a manager for any Pola ships, but publicly available information shows that a "Wingol Barcelona S.L." was the commercial manager of a Pola owned vessel. (Kissane Decl. Ex. A). The commercial manager is often under common beneficial ownership with the vessel owner, as is the case with Debtors. Thus, it certainly appears Wingol has some connection with Pola, despite Debtors' claimed lack of knowledge of any affiliation. Mr. Terechtchenko thought that

Wingol was incorporated in the Virgin Islands. It is not unusual for such jurisdictions to allow ownership of a company through "bearer shares" whereby whoever holds the shares at the time can claim to own the company. This allows people to claim they do not know who the actual owner is, although anyone familiar with the company will know who controls it. This is a relatively common form of ownership of companies in international shipping.

17. Even more important than the suspected impropriety of the reductions in Hire, the Debtors have not made any showing that the Charters can successfully support the Debtors' reorganization. Because the Charters make up 100% of the Debtors' income, it should be incumbent on Debtors to show that they can reorganize and, *inter alia*, service the secured debt as part of any assumption of these very significant contracts, particularly when there is no requirement under the Bankruptcy Code to rush into an assumption of any contract. Pursuant to 11 U.S.C. §365(d)(2), the debtor-in-possession need not elect assumption or rejection of an executory contract until confirmation of a plan. *In re Nat'l Steel Corp.,* 316 B.R. 287, 304 (Bankr. N.D. Ill. 2004); *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 27 (2d Cir. 1996). Debtors have not even proposed a plan of reorganization yet, so the deadline for assumption or rejection of contracts – confirmation of a plan – is nowhere near.

18. Simply assuming the Charters and hoping for the best would leave the Debtors and their creditors with little in the way of options. If it is ultimately in the best interest of the Debtors and the creditors to sell a vessel, or if the Debtors must convert to a Chapter 7, the early, improvident assumption of the Charters would leave the estate saddled with expensive administrative claims and potentially maritime liens for breach of the Charters. "If a debtor-in-

possession assumes an executory contract, 'it assumes the contract cum onere,' and the liabilities incurred in performing the contract will be treated as administrative expenses under § 503(b)(1)(A)." *In re Nat'l Steel Corp.,* 316 B.R. 287, 304 (Bankr. N.D. Ill. 2004). In addition, breach of the charter could result in a maritime lien.

19. The proposed assumption of the Charters really constitutes a reorganization plan. Such sub-rosa reorganization plans are prohibited "based on a fear that a debtor-in-possession will enter into transactions that will, in effect, "short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan." *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007). Although Debtors are attempting to lock all of their assets into long terms contracts, Debtors have failed to show that they can be viable under these charters. Nor have the Debtors proposed adequate protection for creditors for reducing the priority of their pre-petition security interests. See *In re Continental Airlines,* 750 F.2d 1223 (5th Cir. 1986); *In re Belk Properties, LLC,* 421 B.R. 221 (N.D. Miss. 2009). Given that HSH received Debtors' 6 month budget only a few days before this objection was due and the lack of any financial analysis provided in support of the Motion, it is premature to lock in Debtors to three year contracts that tie up all of the Debtors' income-generating assets and that could potentially generate massive damages in the event that a later plan requires a vessel to be sold or chartered to someone else.

B. **Practical Considerations**

20. On a practical basis, it is undisputed that market hire rates for the types of vessels owned by Debtors currently are at or near historically low levels. As such, most owners are choosing to charter their vessels for shorter periods, and profit from the expected improvement in

rates over the next few years. Debtors took the opposite tack, and renegotiated the Charters, increasing the term from one to three years, and then, immediately prior to the Petition Date, renegotiating again to significantly reduce the rate of hire paid to the Debtors. This is not only counter to the expected business judgment, but raises the prospect of a preference or collusion.

21. Moreover, another major consideration is the credit-worthiness of the Charterer, Pola. Since all of Debtors' four ships will be chartered to Pola, the question of whether Pola will continue to be able to perform is of paramount importance. Debtors provide no information about Pola or its financial stability, or about Pola's connection to creditor Wingol (other than a statement that Wingol "may be" related to Pola).

22. Debtors provide no options as to potential other charters, sales of a vessel or vessels or other employment opportunities that might support a reorganization. Nor have Debtors apparently investigated the option of a "profit share" with Pola if rates increase, so that Debtors realize some benefit from potential charter market rate increases.

**CONCLUSION**

For the foregoing reasons, HSH respectfully request that this Court deny the Motion to Assume the Pola Charters as premature and unsupported, and to allow HSH sufficient time to conduct discovery on the relationship between Wingol, Pola and Debtors.

          Respectfully submitted,

          */s/ Michael R. Enright*
          Michael R. Enright
          ct10286
          Robinson & Cole LLP
          280 Trumbull Street
          Hartford, Connecticut 06103
          Fax: 860 275 8299
          Phone: 860 275 8290
          menright@rc.com

          and

          John G. Kissane
          Jane Freeberg Sarma
          Watson, Farley & Williams LLP
          1133 Avenue of the Americas
          11th Floor
          New York, New York 10036
          Fax: (212) 922 1512
          Phone: (212) 922 2200
          jfreeberg@wfw.com

          ATTORNEYS FOR
          HSH NORDBANK AG

### **CERTIFICATION OF SERVICE**

    I, Michael R. Enright, hereby certify that on this 21st day of April, 2015, I filed the this Objection using the CM/ECF system, whereby all parties receiving electronic notices will receive notification of the filing thereof, who are all the parties entitled to service thereof.

                                                    /s/ *Michael R. Enright*
                                                    Michael R. Enright