## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------------------------------------X
                                                 )
In re                                            )        Chapter 11
                                                 )
SOBELMAR ANTWERP N.V., et al.¹                   )        Jointly Administered Under
                                                 )        Case No. 15-20423 (AMN)
                        Debtors.                 )
-----------------------------------------------------------X
```

### HSH NORDBANK AG'S MOTION (I) TO DECLARE THE EARNINGS OF THE VESSELS ARE NOT PROPERTY OF DEBTORS' ESTATE, AND (2) TO DISMISS OR ABSTAIN

Secured creditor HSH Nordbank AG ("HSH"), by and through its counsel, hereby submits this Motion (i) to Declare the Earnings of the Vessels are not Property of Debtors' Estate, and (ii) to Dismiss or Abstain.

## I.      INTRODUCTION

1.      Sobelmar Antwerp N.V. and its debtor affiliates in this case (the "Debtors") filed their Chapter 11 petition on March 17, 2015 (the "Petition Date").

2.      Prior to the Petition Date, HSH made two loans to Debtors.  (Ex. A, Declaration and Opinion of Hendrik Stephen Brauns dated May 22, 2015 ("Brauns Decl.") ¶¶2, 5).  The first, under a loan agreement dated June 25, 2007 (the "First Loan Agreement") with Debtors SBM-1 Inc., SBM-2 Inc. and SBM-3 Inc., was in the maximum amount of $61,425,000.00 for the purchase of m/v BRASSCHAAT ("BRASSCHAAT"), registered in the ownership of SBM-1 Inc., m/v VYRITSA ("VYRITSA"), registered in the ownership of SBM-2 Inc. and m/v KOVDOR ("KOVDOR"), registered in the ownership of SBM-3 Inc.  (Ex. A, Brauns Decl. ¶2).

---

¹ Case No. 15-20423 – Sobelmar Antwerp N.V., Case No. 15-20424 – Sobelmar Shipping N.V, Case No. 15-20425 – SBM-1 Inc., Case No. 15-20426 – SBM-2, Inc., Case No. 15-20427 – SBM-3 Inc., Case No. 15-20428 – SBM-4 Inc.

3.      HSH made a second loan to Debtors under a loan agreement dated December 20, 2007 (the "Second Loan Agreement" and together with the First Loan Agreement, the "Loan Agreements") with Debtor SBM-2 in the maximum amount of $21,000,000 for the purchase of m/v ZARECHENSK ("ZARECHENSK", and together with BRASSCHAAT, VYRITSA and KOVDOR, the "Vessels").  (Ex. A, Brauns Decl. ¶5).

4.      The obligations of the Debtors to HSH under the Loan Agreements are secured by, *inter alia*, assignments of the earnings of the Vessels, including the earnings paid by Debtor Sobelmar Shipping N.V. as bareboat charterer of the Vessels and the earnings received by Debtor Sobelmar Shipping N.V. from third party charterers.  (Ex. A, Brauns Decl. ¶¶4, 7).

5.      The First Loan Agreement and the Second Loan Agreement are fully cross-collateralized; the security provided by the Debtors pursuant to each of the Loan Agreements[2] secures Debtors' obligations under both Loan Agreements.  (Ex. A, Brauns Decl. ¶8).

6.      Both of the Loan Agreements and all the assignments of earnings are governed by German law.  (Ex. A, Brauns Decl. ¶2, 4, 5 and 7).

7.      On June 3, 2013, one tranche under the First Loan Agreement (Sub-Tranche 2.B.2) in an amount of $3,000,000.00 became due and payable. On October 14, 2013, a second tranche under the First Loan Agreement (Sub-Tranche 3.B.2), also in an amount of $3,000,000.00, became due and payable under the First Loan Agreement.  Debtors failed to pay either of these tranches.  (Ex. A, Brauns Decl. ¶10).

8.      On December 19, 2014 HSH terminated the First Loan Agreement and demanded

---

[2] The assignments of earnings with respect to BRASSCHAAT secure only the obligations of the Debtors under the First Loan Agreement, not the Second Loan Agreement.

immediate repayment of all amounts outstanding under the First Loan Agreement.  (Ex. A, Brauns Decl. ¶12).   Upon termination of the First Loan Agreement, the loan granted thereunder was accelerated and all amounts owing under the First Loan Agreement became due and payable. (*Id.*)  Upon Debtors' default in payment of such amounts, the loan under the Second Loan Agreement was accelerated pursuant to Clause 20.13 of the Second Loan Agreement and all amounts owing under the Second Loan Agreement became due and payable.

9.      As of December 19, 2014, the principal amount outstanding on both Loan Agreements was $55,733,350.55 ($41,721,100.55 for the First Loan Agreement and $14,012,250.00 for the Second Loan Agreement).  (Ex. A, Brauns Decl. ¶¶3, 6).

10.      On or about April 7, 2015, the Debtors filed a motion to assume four charter agreements (the "Charter Motion") with Pola Maritime Ltd. ("Pola" or the "Charterer").   HSH filed its objection to the Charter Motion on April 21, 2015.  A hearing on the Charter Motion is scheduled before this Court on June 3.

## II.      MOTION TO DECLARE EARNINGS NOT PROPERTY OF THE ESTATE

11.      As part of the security package for the loans, Debtors granted to HSH a valid assignment over the earnings of each of the Vessels.  (Ex. A, Brauns Decl. ¶25).  Each of the assignments are governed by German law.  (Ex. A, Brauns Decl. ¶¶4(j) and 7(b); Ex. A, Brauns Decl. Ex. 3 - 5). Under German law, HSH is the sole owner of the earnings (Ex. A, Brauns Decl. ¶26)[3].  HSH has sole power to collect the earnings and to use the earnings (Ex. A, Brauns Decl. ¶26).  The Debtors had only a "temporary license" to collect the earnings, which terminated along with the termination of the First Loan Agreement on December 19, 2014.  (Ex. A, Brauns Decl. ¶26).

---

[3] HSH intends to have Mr. Brauns appear to give testimony on German law issues at the hearing on this motion.

Sobelmar no longer has any rights to collect the earnings, which are the sole property of HSH. (Ex. A, Brauns Decl. ¶28). The earnings, therefore, are not property of the Estate.

A.   Earnings Are Property of the Estate only to the extent of Debtors' Interest

12.   The earnings are the property of the Estate only to the extent that the Debtors have an interest in the earnings. Under Section 541 of the Bankruptcy Code, the Debtors' estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 US.C §541(a)(i). Section 541, however, does not grant to the Debtors any greater interests in property than the Debtors had prior to bankruptcy. *Kipp v. Depoy* (*In re Depoy*), 29 B.R. 466, 469 (Bankr. N.D. Ind. 1983) ("The estate succeeds to no more interest than the debtor had, and the estate takes its interest subject to the conditions under which the debtor held the interest."). Section 541 is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. *In re Madison Heights Group, LLC,* 506 B.R. 734, 740 (E.D. Mich. 2014), citing *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (internal citations omitted); *see also French v. Johnson (In re Coomer),* 375 B.R. 800, 804 (Bankr. N.D. Ohio 2007); *In re Lally,* 51 B.R. 204, 205 (N.D. Iowa 1985) (finding that "whatever rights a debtor has in property when his bankruptcy petition is filed continue in bankruptcy—no more, no less"); *In re S. Side House, LLC,* 474 B.R. 391, 402 (Bankr. E.D.N.Y. 2012).

B.   Debtors' Interest in the Earnings Must Be Determined Under German Law

13.   Courts have consistently held that the nature and extent of the Debtors' interest in property is determined by non-bankruptcy law. *Butner v. U.S.*, 440 U.S. 48, 54 (1979); *In re Koula*

80357110v4

*Enterprises, Ltd.*, 197 B.R. 753 (Bankr. E.D.N.Y. 1996); *In re Prudential Lines Inc.*, 928 F.2d 565 (2d Cir. 1991).  Here, the assignments, as well as the loan agreements and all other security documents (other than the mortgages and certain Belgian law governed pledges of earnings of the Vessels), are governed by German law (Ex. A, Brauns Decl. ¶¶4(j) and 7(b)), and therefore this Court must look to German law to determine if the earnings of the Vessels are property of the Debtors' estate.

C.      Under German law, the Earnings are the Sole Property of HSH

14.      Under German law, legal title to the earnings passed to HSH with the assignment of the earnings to HSH.  (Ex. A, Brauns Decl. ¶25).  HSH has the sole power to (i) collect the earnings, (ii) dispose of the earnings, (iii) make a claim for the earnings (either in court or otherwise), and (iv) assign the rights to the earnings to a third party.  (Ex. A, Brauns Decl. ¶26).

15.      Prior to the Debtors' default in payment of two tranches under the First Loan Agreement, the Debtors were permitted by HSH to collect the earnings under a "temporary use" license pursuant to German law.   (Ex. A, Brauns Decl. ¶28).   HSH gave the Debtors temporary permission to collect the earnings, and limited the Debtors' rights to the earnings to depositing the earnings into the Earnings Account at HSH.  (Ex. A, Brauns Decl. ¶28).  However, the Debtors' license to collect the Earnings terminated along with the termination of the First Loan Agreement on December 19, 2014.  (Ex. A, Brauns Decl. ¶29).  The Debtors no longer have authority to collect the earnings of the Vessels; only HSH has that right.  (Ex. A, Brauns Decl. ¶31).

16.      Although no notice of assignment is required under German law for HSH to have sole right to the earnings, HSH did give notice of the assignments of the earnings to the Charterer.

(Ex. A, Brauns Decl. ¶¶19, 21, 27).  The Charterer, however, continued to pay the earnings to the Debtors.  The Debtors' and the Charterer's failure to comply with German law, however, does not create any rights in the earnings for the Debtors (although it may give rise to a cause of action by HSH against the Charterer).

17.     The Debtors no longer have an interest in the earnings, and therefore the earnings are not part of Debtors' estate.  Courts have held that if under the governing local law, a debtor's interest in rents has been terminated prepetition by an absolute assignment, upon the commencement of the bankruptcy case the assigned rents are not property of the estate.  See, e.g., *In re Jason Realty, L.P.,* 59 F.3d 423, 425 (3d Cir. 1995) (finding that debtor did not have an ownership interest in rents and the rents were not property of the estate); *In re Loco Realty Corp.,* 2009 WL 2883050, at *5–6 (Bankr. S.D.N.Y. 2009) (holding that creditor held prepetition title to rents, and the rents could not be used to fund the debtor's Chapter 11 plan); *R.A. Hendrickson Real Estate, Inc. v. Weisman (In re R.A. Hendrickson Real Estate, Inc.),* 395 B.R. 565, 579–80 (Bankr. E.D.N.Y. 2008) (finding that debtor had a right of redemption, but not an interest in the rents, where creditor's tax lien and treasurer's deed served to terminate debtor's title to the property); *In re Woodmere Investors Ltd. Partnership,* 178 B.R. 346, 360 (Bankr. S.D.N.Y. 1995) (under Michigan law, rents were not property of the estate).  Under German law, the Debtors' interest in the earnings of the Vessels had been terminated pre-petition by the assignment of the earnings and the termination of the First Loan Agreement.  (Ex. A, Brauns Decl. ¶¶25, 29, 36, 37).  Only HSH has an interest in the earnings of the Vessels.

18.     In *In re Soho 25 Retail, LLC,* 2011 WL 1333084, at *8-9 (Bankr. S.D.N.Y. 2011), affirmative steps taken by a creditor to enforce its rights under an assignment of rents clause left

80357110v4

the debtor with an insufficient interest in the rents to make the rents property of the estate.  The

Court stated that where a debtor "has only an interest in the rents to the extent a mortgage is ever

satisfied, the cash flow from the rents is not property of the estate until the mortgage is satisfied."

(citing *In re Loco Realty Corp.,* 2009 WL 2883050, at *6 (Bankr. S.D.N.Y. 2009)).

19.     The Court in *Soho 25* noted in particular that the assignment provided additional rights to

the lender upon an event of default, including the debtor's appointment of the lender as its

"attorney-in-fact with full power, in the name and stead of [the debtor] to demand, collect, receive

and give complete acquittance for any and all of the rents now due or that may hereafter become

due." (at *2).  The assignments of earnings of the Vessels executed by the Debtors contain a

similar grant of power:

> The Assignor does hereby constitute the Assignee the Assignor's true and lawful Attorney
> irrevocably with full power (in the name of the Assignor or otherwise) to ask, require,
> demand, receive, compound and give acquittance for any and all moneys and claims for
> moneys due and/or to become due under or arising out of any charter party or contract of
> affreightment made by the Assignor and to endorse any cheque or instrument or order in
> connection therewith and to file any claims or take any action or institute any proceedings
> which to the Assignee may deem to be necessary or advisable in the premises.

(Ex. A, Brauns Decl., Ex. 3 – 5, Clause 5).


20.     See also, in *In re Northwest Commons, Inc.,* 136 B.R. 215, 219-22 (Bankr. E.D. Mo.1991),

("when a mortgagee completes all steps necessary to enforce its rights under an assignment of rent

clause pre-petition, all interests of the Debtor in the rents are extinguished and the rents do not

become property of the estate or cash collateral"); *In re VIII South Michigan Associates,* 145 B.R.

912, 914–915 (N.D. Ill. 1992) (a creditor who sent demand letters to tenants after the debtor's

default but prior to the debtor's chapter 11 proceeding divested the bankruptcy estate from

ownership of the rents because the creditor had "perfected" and "enforced" its rent assignment.)

21.     Although a notice of the assignment is not needed to perfect an assignment under German law, HSH provided notice to the Charterer of the assignments of earnings, and directed the Charterer to pay the earnings to HSH.  (Ex. A, Brauns Decl. ¶19).  The Charterer failed to do so; the Charterer's failure to comply with the notice of assignment does not create an interest of the Debtors in the earnings of the Vessels.

22.     Under German law, HSH has the sole right to the earnings, and the earnings are no longer property of the Debtors and therefore are not part of Debtors' estate.  HSH requests that this court enter an order confirming that the earnings are not part of the Debtors' estate.

## II.     MOTION TO DISMISS OR TO ABSTAIN

### A.     Failure to Provide Adequate Protection

23.     As a condition to their use of HSH's collateral, including the cash collateral and the Vessels mortgaged to HSH, the Debtors must provide HSH with adequate protection. 11 U.S.C. §§ 361, 363(c)(2); *see also U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).  Other than the earnings of the Vessels assigned to HSH, the Debtors are without other income.  (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015 at 35; "Q: The income generated by the four vessels, that is all the income that your company has to survive on? A: Yes.").  Because the Debtors are unable to provide any adequate protection for the use of HSH collateral, the Chapter 11 petitions should be dismissed or the stay lifted.

24.     This Court may dismiss the Chapter 11 petitions based on "cause", which may include lack of adequate protection provided to the secured lenders.  11 U.S.C. §362(d)(1) provides that a "Court shall grant relief from the stay provided under subsection (a) of this section . . . for cause, including the lack of adequate protection of an interest in property of such party in interest."

Courts have held that the term "cause" as used in Section 362(d) has the same meaning as "cause" as a basis for conversion or dismissal under Section 1112(b).  See *Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co. (In re Laguna Assocs. Ltd. P'ship),* 30 F.3d 734, 737-38 (6th Cir. 1994) ("we see no substantive difference between the cause requirement for dismissal of a petition under Section 1112(b) and the cause requirement for relief from an automatic stay under Section 362(d)(1) . . .").  The Debtors bear the burden of proof on the issue of adequate protection. 11 U.S.C. § 363(p)(1); *see also In re Riverwood La Place Associates,* 1998 WL 908949, at *2 (Bankr. E.D.N.Y. 1998).

25.    The only "adequate protection" that has been offered to HSH by Debtors in this proceeding is a replacement lien on revenues of the Vessels mortgaged to HSH.  This, however, is insufficient, as those funds have already been assigned to HSH. (Ex. A, Brauns Decl. ¶25). Moreover, according to Debtors' recent budgets, the Debtors are using almost all the funds simply to run the business.  The Debtors are not paying either HSH or KBC.  As the court in *In re Builders Grp. & Dev. Corp.*, 502 B.R. 95 (Bankr. D.P.R. 2013), noted in similar circumstances, "[t]he fact that rental income is utilized to pay the operating expenses of the shopping center by itself does not provide the adequate protection required under 11 U.S.C. § 363 for the security interest regarding the assignment of rents. See *In re River Oaks Ltd. Partnership*, 166 B.R. at 94, 99 (E.D. Mich. 1994) ("The Court does not believe the mere fact that the rental income is used to pay the necessary expenses of operating and maintaining the property or that the property is adequately maintained and not depreciating, in and of itself, provides the adequate protection required under § 363 for the security interest covered by the assignment of rents.")." *In re Builders Grp. & Dev. Corp.*, 502 B.R. 95, 122 (Bankr. D.P.R. 2013).

26.     The Debtors are unable to offer any other adequate protection to HSH.  As a condition to their use of HSH's collateral, including the cash collateral and the four Vessels mortgaged to HSH, the Debtors must provide HSH with adequate protection. 11 U.S.C. §§ 361, 363(c)(2); *see also U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).    Debtors have a small amount of liquidity now only because the Debtors have failed to make any payments to both HSH and KBC after the Petition Date.  No payments are being made to the secured lenders, but the funds generated by the Vessels (over which HSH has a lien) are being expended for the operation of the Debtors, eating away at HSH's collateral.  Debtors locked in their charter rates at the lowest market in 20 years (Ex. C, Transcript of hearing, dated as of April 16, 2015 at p.42, lines 1-2).  The Debtors continue to use the Vessels in their operations, and the Vessels are depreciating and suffering wear and tear.  In addition, the market value of the Vessels are at risk of decreasing, given the downward spiral in the market for second hand dry bulk vessels such as the Vessels.  There is a significant risk that the value of HSH's collateral will be eroded during this bankruptcy proceeding, and the Debtors simply do not have anything else to offer to HSH as adequate protection.  HSH, therefore, requests that this Court dismiss the bankruptcy proceeding due to the Debtors' failure to provide adequate protection.

    B.      Lack of Jurisdiction

    1.      Debtors Have Attempted to Manufacture Bankruptcy Jurisdiction

27.     Debtors had no connection with Connecticut, or even the United States at all (other than occasional calls by a Vessel at a port in the U.S., under direction of non-related time charterers), until Debtors deposited funds with their attorneys immediately prior to filing the Petition. In anticipation of this Chapter 11 proceeding, the Debtors sent a retainer to Bracewell & Giuliani in

January to pay for the bankruptcy planning, and then in March sent the additional $60,000 ($10,000 per Debtor) to establish accounts in Connecticut. (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015 at 52-53). The Petition was filed on March 17, 2015.  The Debtors' accounts were not established until after April 14, 2015.  (*Id.* at 53).   At the hearing on Debtors' first day motions, Debtors' counsel flatly stated that the Debtors' property was "put here to establish jurisdiction and venue . . . nothing more than that."  Although 11 U.S.C. §109(a) provides that "a person that . . . has . . . property in the United States" may be a debtor in bankruptcy, transferring property to the United States on the eve of bankruptcy solely for the purpose of establishing this threshold is an insufficient basis for this Court's jurisdiction.

28.     The Debtors' attempt to manufacture jurisdiction should be disregarded, and any bankruptcy or restructuring proceeding should be brought only where the Debtors actually have a place of business or property.  In *In re McTague*, 198 B.R. 428, 432 (Bankr. W.D.N.Y. 1996), the Court held that, even though jurisdiction of the bankruptcy court might be established based upon a small amount - $194 - of property in the United States, "if property has been specifically placed or left in the United States for the sole purpose of creating eligibility that would otherwise not exist, then dismissal might be appropriate on other grounds, such as a bad faith filing, 11 U.S.C. §707(a); 'substantial abuse' of the provisions of Chapter 7, 11 U.S.C. §707(b); or under principles of abstention, 11 U.S.C. §305."  See also *In re World of English*, 23 B.R. 1015, 1023 (Bankr. N.D. Georgia 1982), finding that the bankruptcy court had jurisdiction since "there being no evidence that the bank account was transferred from Japan to California merely to create jurisdiction for a future bankruptcy proceeding involving Debtors. . ." and retaining jurisdiction; *In re Head*, 223 B.R. 648, 651 - 52 (Bankr. W.D.N.Y. 1998), noting that "the Debtors established a façade of eligibility by obtaining U.S. mailing addresses and opening small bank accounts in

80357110v4

U.S. banks. . ." and holding that "if these Debtors were to continue to assert eligibility by virtue of having acquired U.S. mailing addresses and opening small bank accounts in the U.S., then this Court would directly hold that one cannot so manufacture eligibility, as was suggested in *McTague*."

29.    Although Debtors' Vessels may have visited the United States sporadically, this is insufficient to establish jurisdiction under the due process clause.  Indeed, courts have held that 100 port calls in five years was insufficient to establish jurisdiction over a defendant vessel owner in Pennsylvania, particularly where the vessels were chartered to third parties and the owner had no control over the location of the vessels.  *Conner v. Bouchard Transp. Co.*, 1993 WL 388274 (E.D. Pa. Sept. 30, 1993).  The Court in *Conner* commented that the defendant vessel owner "has no control over where its vessels sail. It operates strictly as a charter business, in which the charterer, rather than Bouchard, dictates where the vessels are to go. Thus, the fact that Bouchard's ships dock in Pennsylvania can best be described as 'haphazard and fortuitous,' rather than 'systematic and continuous.'"  *Id.* at *262.

30.    Similarly, Debtors also charter their Vessels to third-parties and any calls in the United States were done at the direction of these third-party charterers. (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015 at 48-49)**.** Accordingly, if a Vessel visited the United States, it was fortuitous and not an adequate basis for general jurisdiction.

31.    Debtors in this proceeding had no connection whatsoever with the United States prior to their planning for a bankruptcy filing, unlike the debtors in *In re Marco Polo Seatrade B.V.,* Case No. 11-13634 (JMP) (Bankr. S.D.N.Y.) (in which Debtors had an interest in a pool account held by OSG in New York, as well as retainers paid to Bracewell & Giuliani) or in *In re Baytown*

*Navigation Inc.,* Case No. 11-35926 (Bankr. S.D.N.Y.) (in which Debtors had, among other jurisdictional connections, a subsidiary organized in Texas and a corporate officer based in New Jersey as well as retainers paid to Bracewell & Giuliani).  Debtors' opening of accounts with a small deposit of $60,000 (covering all six of the Debtors) and payment of a Bracewell & Giuliani retainer should not be sufficient to create jurisdiction where there was previously no connection to the United States.

> 2.      Due Process Considerations

32.      The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996).  Here, it is clear that Debtors' claims and defenses have nothing to do with the United States. Thus, the "minimum contacts" inquiry must be evaluated under the rubric of general jurisdiction, rather than under the specific jurisdiction framework. This consideration follows because the Petition clearly does not "arise out of" Debtors' conduct in the forum, i.e., borrowing money in Europe that it has now failed to pay. See *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 257 (S.D.N.Y. 2004).

33.      The Supreme Court recently held in *Daimler AG v. Bauman*, 571 U.S.___, 134 S.Ct 746, 187 L.Ed.2d 624 (2014), that a federal court may only exercise general jurisdiction over a foreign defendant corporation that maintains such a presence in the state that its "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." The former rule that a substantial, continuous and systematic course of business was sufficient to subject foreign corporations to jurisdiction is no longer Constitutionally permitted.  Indeed, the

Supreme Court referred to such a test as "unacceptably grasping", and stated that it should be used only for considering whether specific jurisdiction would be appropriate.  (*Id.* at 761).

34.     The Constitutional impact of the *Daimler* decision cannot be ignored in this case.  Here, none of the parties are "at home" in the United States and therefore would not be subject to general jurisdiction here.  HSH currently maintains a small branch office in New York.  That office employs only about 50 people, out of the approximately 2,600 full time people employed by HSH worldwide. (Ex. D, Declaration of Joerg Schelp dated May 22, 2015 ("Schelp Decl.") ¶9).  HSH has two head offices, both located in Germany, in Keil and Hamburg. (*Id.* ¶5). HSH has six additional offices in Germany. (*Id.* ¶6).  HSH also has offices in Luxembourg, Athens, Greece, Singapore and Hong Kong. (*Id.* ¶7). Clearly, one branch office in New York is insufficient to call HSH "at home" in the United States.  (*Id.* ¶¶7, 10).  HSH is therefore not subject to the general jurisdiction of this Court.

35.     Although HSH has little connection with the United States, Debtors have less.  Debtors are "at home" only in Belgium, and certainly not in the United States, where their only connection are bank accounts created after the bankruptcy filings, and a retainer paid to their bankruptcy counsel. Debtors' managing director, Mr. Terechtchenko, testified that Debtors own three pieces of real property, all located in Belgium. (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015 at 39-44).  Debtors only office is in Belgium. (*Id.* at 45).  All employees of Debtors are located in Belgium, except for three superintendents in Russia. (*Id.* at 45-46). All of Debtors' three largest creditors, HSH, KBC and Wingol, are located outside of the United States.  Debtors have even complained that it would be too burdensome to use the DIP accounts set up in the United States as their business accounts and they have argued vigorously to continue to use their

80357110v4

accounts in Belgium to run their business. (Debtors' Cash Management Motion, dated March 17, 2015, Docket # 8).

36.     Debtors are engaged in the most blatant of forum shopping exercises, to the detriment of HSH.  This bankruptcy proceeding is fundamentally a restructuring of Debtors' debt to HSH. None of the usual bankruptcy considerations that could justify a United States' court exercising jurisdiction over a foreign debtor's restructuring are present in this case.   No committee of unsecured creditors has been appointed.  It appears that all unsecured creditors are being paid through the critical vendor orders.   Even when HSH objected that the Debtors' broker did not have a lien and was not critical – the broker was still paid.  Debtors' other secured creditor, KBC, has a relatively secure position.  KBC has mortgages on real estate in Belgium, a memorandum of sale relating to some of the real property, and additional security in the form of a personal guarantee of Mr. Terechtchenko and some security interest in other real property owned by Mr. Terechtchenko. (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015, at 39-43). Thus, this is, in essence, a two party case.

37.     In this proceeding, the Constitutional due process issues are more clearly drawn than in the usual bankruptcy context (where a list of the 20 largest creditors has meaning other than as a match to the critical vendors list). There are other fora available to Sobelmar, both Belgium and Germany, where HSH would be amenable to jurisdiction.  It is not the duty of the U.S. bankruptcy courts to provide a forum to any foreign person that deposits, on the eve of bankruptcy, property into the United States so that it may avail itself of the protections of the Bankruptcy Code.  Under Debtors' reasoning, any entity worldwide could declare bankruptcy in the United States – as long as they pay a retainer to their counsel first.

80357110v4

38.    Although HSH appeared in this Court, as a secured creditor owed in excess of $50 million, HSH had no choice.  The rulings of this Court will determine the validity of HSH's security and amount of any recovery, thus affecting HSH's rights.  Any notion that HSH appeared voluntarily is an illusion.

39.    On a more practical basis, in the event that there is any dispute over HSH's claim, HSH will be forced to bear the expense of bringing in German law experts to provide their testimony concerning the German law loan agreements and security documents.  Moreover, Debtors are also subject to inordinate expenses due to the forum they have chosen.  These expenses are not immaterial and include flying in their witnesses from Belgium for hearings, and employing foreign law experts such as Mr. Falkenberg.  In fact, Debtors have sought permission for payment of five different foreign law firms, including two German law experts (Ince & Co. Germany LLP, Falkenberg Law Offices); two Belgium law firms (Maetis Advocaten, Mercurius Lawyers) and one English firm (Ince & Co. LLP).  (See "Motion of the Debtors for Entry of an Order Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business"; Docket #58, Ex. B).  In addition, Debtors have complained about incurring transactional fees in shifting funds from the DIP accounts in Connecticut to operating accounts in Belgium and vice versa.  Although Debtors appear well able to bear these expenses given the moratorium on paying creditors, it is all at the cost of HSH who is not being paid, and who has a lien on all the revenue of the Debtors.  HSH and all other creditors of the Debtors are entitled to the due process protections of the Constitution, and Debtors' attempt to manufacture jurisdiction before this Court should not obscure the rights of its creditors.

80357110v4

40.    According to applicable Supreme Court guidance, "great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 258 (S.D.N.Y. 2004).   Although 11 U.S.C. §109(a) may allow jurisdiction based upon scant contacts of the Debtors with the United States, where the only U.S. connections are those that were created by Debtors on the eve of bankruptcy, the due process considerations that must be given to the creditors become much more crucial.  Clearly, if this were an action brought in the United States District court against HSH, the District Court could not Constitutionally exercise personal jurisdiction over HSH.  When HSH entered into the Loan Agreements and throughout its relationship with the Debtors, it had no reason to believe it would be forced to enforce and defend its interests before a U.S. court.  All the operative loan documents between HSH and the Debtors are governed by German law and include a choice of German forum.  The loan was administered from Germany. (Ex. D, Schelp Decl. ¶12). The Debtors had no connection to the U.S. until shortly before the bankruptcy.  It is difficult to believe that by depositing $10,000 each with their lawyer a week or two before the Petition was filed the Debtors could cure such a Constitutional limit to the Court's jurisdiction.

41.    The fact that none of the parties are subject to the jurisdiction of the United States courts raises significant issues that must be addressed.  Although the bankruptcy courts may have extended jurisdiction, they cannot extend their jurisdiction beyond what is authorized by the United States Constitution. The tenuous and artificial contacts of the Debtors with the United States and the complete lack of jurisdictional contacts sufficient to exercise general jurisdiction over HSH require the dismissal of this action under the due process clause of the United States Constitution.  U.S. Const. Amend. V, XIV.

3.      Forum Non Conveniens

42.      This proceeding should be dismissed on the basis that the United States is an inconvenient

forum.

43.      The court *In re Globo Comunicacoes e Participacoes S.A.* held, "the Bankruptcy Court

must weigh the private and public interest factors articulated by *Gulf Oil Corp. v. Gilbert*, 330

U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), as being relevant to the determination of

whether forum non conveniens dismissal is appropriate:

Private interest factors include: (1) the relative ease of access to sources of proof; (2) the
availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining
attendance of willing witnesses; (4) issues concerning the enforceability of a judgment; and (5) all
other practical problems that make trial of a case easy, expeditious, and inexpensive—or the
opposite. Public interest factors include: (1) the administrative difficulties flowing from court
congestion; (2) the local interest in having controversies decided at home; (3) the interest in
having a trial in a forum that is familiar with the law governing the action; (4) the avoidance of
unnecessary problems in conflict of laws or in the application of foreign law; and (5) the
unfairness of burdening citizens in an unrelated forum with jury duty.

*United Feature Syndicate*, 216 F.Supp.2d at 207.   Should the Bankruptcy Court determine that

forum non conveniens considerations may warrant dismissal of the Petition, it should apply the

relevant factors in the first instance."   *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R.

235, 258-59 (S.D.N.Y. 2004)

44.      Here, it is clear that all private interest factors favor dismissal. All sources of proof are in

Belgium or Germany.   Debtors' files are in Belgium (Ex. C, Transcript of hearing, dated as of

April 16, 2015 at 51).   HSH is in Germany. (Ex. D, Schelp Decl. ¶5).   HSH administered Debtors'

loan from Germany.   (Ex. D, Schelp Decl. ¶12).   KBC, the other secured creditor, is in Belgium.

This Court cannot compel useful testimony from witnesses, such as Pola, whereas Pola's

exclusive      agent,      Pola      Maris      N.V.,      has      an      office      in      Belgium.

(https://www.linkedin.com/company/pola-maritime-ltd.).  The cost of attendance of witnesses from Belgium and Germany is clearly a large expense and this is already an issue in this case. Moreover, Debtors have already argued that they should not be required to comply with U.S. law as it would be too burdensome for a company operating in Belgium. For example, the Debtors have requested that they should not be required to use DIP accounts in the United States because it would be too costly and inconvenient.  Debtors have requested the Court deviate from normal procedure to allow the use of accounts in Belgium. (Ex. C, Transcript of hearing, dated as of April 16, 2015 at 16-18).

45.     The public interest factors also clearly favor dismissal.  There are already issues of foreign law that will need to be decided by the Court, namely who owns the earnings of the Vessels. Other issues, such as deductions by Debtors for supposed compulsory payments required to employees and for taxes by the Belgium government, would also be much more transparent in Belgium. (*Id.* at 32 - "And this being Belgium the government probably takes a large part of that.")  Debtors have also claimed other expenses, such as outside auditors, are required under Belgium law.  (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015 at 121).  One of the main unsecured creditors being paid is a company that "it's some kind of U.S. Trustee, or whatever.  They're supervising how correct we are following the law [in Belgium] in paying the salary to our staff." (*Id.* at 121-122).  Foreign law so dominates this proceeding that Debtors have brought their foreign lawyer Mr. Falkenberg to the United States every time they have testified in this Court and have requested that this Court approve the payments to Mr. Falkenberg and four other foreign law firms as legal advisors under German, Belgium and English law. (Docket #58, Ex. B).  Since Debtors own real property in Belgium, Belgium courts would necessarily have a much greater interest and expertise in deciding how these assets are administered.  Any issues

80357110v4

concerning the loans and security interests of HSH would be governed by German law.  Issues

related to KBC's interests would almost certainly be governed by Belgian law.  Finally, the

United States simply has no interest in this proceeding or the Debtors, all of whose employees are

in Belgium or Russia and whose only asset in the United States is an account established for this

bankruptcy.

C.    Abstention or Dismissal Under §305(a)(1)

47.    11 U.S.C. §305(a)(1) provides that a bankruptcy court may dismiss or suspend all

proceedings if "the interests of creditors and the debtor would be better served by such dismissal

or suspension."   In *In re Sapphire Dev., LLC,* this Court set forth a seven factor test for

determining if abstention is warranted in the interests of creditors and the debtor:

> (1) the economy and efficiency of administration; (2) whether another forum is
> available to protect the interests of both parties or there is already a pending
> proceeding in state court; (3) whether federal proceedings are necessary to reach a
> just and equitable solution; (4) whether there is an alternative means of achieving
> an equitable distribution of assets; (5) whether the debtor and the creditors are able
> to work out a less expensive out-of-court arrangement which better serves all
> interests in the case; (6) whether a non-federal insolvency has proceeded so far in
> those proceedings that it would be costly and time consuming to start afresh with
> the federal bankruptcy process; and (7) the purpose for which bankruptcy
> jurisdiction has been sought.

*In re Sapphire Dev., LLC*, 523 B.R. 1, 9 (D. Conn. 2014).

48.    Here, the economy and efficiency of administration weighs heavily in favor of abstention.

Debtors' offices, documents, shareholders, and employees are all located in Belgium, except for

three superintendents in Russia.  (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015

at 44-46).  KBC, a main secured creditor is located in Belgium.  For each evidentiary hearing,

representatives of the Debtors must travel to the United States, increasing expenses of the Estate.

In addition, the loan agreements and security documents that give rise to HSH's claim are all governed by German law.  Any issues arising under those loan agreements and documents would require both the Debtors and HSH to engage foreign legal counsel to act as experts before this Court.  In administering this case, this Court will almost certainly be required to decide German law issues such as those presented in this Motion on who has ownership of the Vessels' earnings.  Indeed, Debtors thought it necessary to bring their German law expert Mr. Falkenberg to the last hearing and the meeting of the creditors.  Since the purpose of this bankruptcy is clearly to restructure HSH's debt (unsecured creditors are being paid off under the critical vendor orders, and KBC's loan is to be paid by sale of property mortgaged to it), economy and efficiency weigh heavily in favor either Belgium or Germany as the appropriate forum.

49.     Another forum is available to the Debtors and their creditors.  Instead of pursuing a bankruptcy proceeding in the United States, the Debtors could seek protection under Belgian insolvency law. (Ex. E, Declaration of Stefaan Deckmyn dated May 22, 2015 ("Deckmyn Decl")).  A Belgian insolvency proceeding would be binding upon all creditors located within the European Union, and would provide the Debtors the same protection of their assets during the reorganization period as afforded by a proceeding before this Court.  Indeed, the Belgium insolvency regime is modeled after Chapter 11.  (Ex. E, Deckmyn Decl. ¶5).  None of the creditors are in the United States, but the two secured creditors in this proceeding, HSH and KBC, are both present in the European Union and would be bound by a Belgian insolvency proceeding.

50.     The third *Sapphire* factor, whether federal proceedings are necessary to reach a just and equitable solution, also weighs in favor of abstention.  Belgium has a procedure before its courts that is similar to Chapter 11, and focuses on the reorganization of the entity and the salvage of the

enterprise. (Ex. E, Deckmyn Decl. ¶6).   If there is a possibility that the Debtors can be successfully reorganized, such reorganization may be accomplished in Belgium at a lower cost than in the United States.   The availability of a reorganization procedure similar to Chapter 11 also meets the fourth *Sapphire* factor, whether there is an alternative means of achieving an equitable distribution of assets, as well as the fifth *Sapphire* factor, whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case.   The savings in travel costs and reduced need to engage foreign counsel in the event that the Debtors sought reorganization under Belgian law would benefit both the Debtors and the creditors, and facilitate working out a less expensive solution.   (See Ex. E, Deckmyn Decl.).

51.     The sixth *Sapphire* factor, whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process, is not present in this proceeding.

52.     The final *Sapphire* factor, the purpose for which bankruptcy jurisdiction has been sought, also weighs in favor of abstention.   The Debtors sought bankruptcy jurisdiction to stop HSH from seeking remedies and foreclosing on its collateral after the First Loan Agreement had been terminated due to the Debtors' default in payment. HSH had notified the Charterer to pay all earnings of the Vessels to HSH.   Debtors have not made any proposal to restructure the HSH debt. Debtors clearly filed this proceeding to prevent foreclosure by HSH.   All other creditors, including unsecured creditors, are being paid or will be paid.   Forcing HSH to come to the U.S. to protect its interest was the purpose of the bankruptcy filing here.

53.     There are no *Sapphire* factors that appear to favor keeping the case in this Court.

80357110v4

D.      Totality of the Circumstances Warrants Dismissal or Abstention

54.      The court in *In re Yukos Oil*, 321 B.R. 396 (Bankr. S.D. Tx. 2005) dismissed that bankruptcy proceeding based on the totality of circumstances under 11 U.S.C. §1112(b).   The Court in *Yukos Oil* noted a number of factors contributing to cause for dismissal, including "the funds which created jurisdiction in this court were transferred to banks in the United States less than one week prior to filing of the petition, and were transferred for the primary purpose of attempting to create jurisdiction in the United States Bankruptcy Court", and noting that "none of the evidence . . . suggest that this court is uniquely qualified, or more able than the other forums, to consider the issues presented."  (Other factors in *Yukos Oil* were also present, including the interests of the Russian government in the reorganization of the Debtor, one of the largest producers of petroleum products in Russia.)  Here, the Debtors clearly attempted to manufacture jurisdiction, opening bank accounts and transferring a retainer to their counsel in anticipation of filing for bankruptcy.  Moreover, when the Debtors' managing director Mr. Terechtchenko was asked why he made the deposit into the account just prior to the bankruptcy his counsel refused to allow him to answer the question. (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015 at 50).  Debtors' counsel commented, "You're asking for his motivation.  They deposited the money in the United States before we filed Chapter 11.  We decline to answer about the motivation."  *Id.* at 51. Given the foreign law issues in this proceeding, with operative documents all governed by German law and Debtors located in Belgium, the Belgium court, which has a reorganization procedure that is similar to Chapter 11, would certainly be a more appropriate forum in which to hear this matter.

80357110v4

55.     Based upon the foregoing, HSH requests that this Court either dismiss the bankruptcy proceeding, or abstain under Section 305(a)(1).

        E.     Bad Faith

56.     11 U.S.C. §1112(b) provides that a court can dismiss a Chapter 11 case or convert it to a case under Chapter 7 "for cause" so long as it is in the best interests of both the creditors and the estate. 7 Collier on Bankruptcy 1112.04 (16th ed. 2011); *In re BH S & B Holdings, LLC*, 439 B.R. 342 (Bankr. S.D.N.Y. 2010). Although 11 U.S.C. §1112(b)(4) contains sixteen examples of events that may constitute cause, this list is not exhaustive and courts are free to consider other factors. See, e.g., *In re Ameribuild Const. Mgmt., Inc.*, 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009). Courts have dismissed or converted Chapter 11 cases based upon "bad faith" by the debtors on filing a petition.

57.     The Second Circuit, in *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304 (2nd Cir 1997) (in the context of a single asset real estate company bankruptcy) listed the following factors that indicate a bad faith filing:

1.     the debtor has only one asset;
2.     the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
3.     the debtor's one asset is the subject of a foreclosure as a result of arrearages or default on the debt;
4.     the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending foreclosure action;
5.     the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
6.     the debtor has little or no cash flow;
7.     the debtor cannot meet current expenses including the payment of personal property and real estate taxes; and
8.     the debtor has no employees.

80357110v4

At 1311; see also *Squires Motel, LLC v. Gance*, 426 B.R. 29 (N.D.N.Y. 2010), *In re AMC Realty Corp.*, 270 B.R. 132 (Bankr. S.D.N.Y. 2001), *In re Syndicom Corp.*, 268 B.R. 26 (Bankr. S.D.N.Y. 2001).

58.     Although not every factor listed in *C-TC 9th Avenue Partnership* is present in this action, a significant number of the factors are, or are substantially similar to the facts of this matter.  In *C-TC 9th Avenue Partnership*, the debtor had only one asset.  Here, Debtors' only assets are four Vessels, all mortgaged to HSH, and some real estate, all mortgaged to KBC.  Debtor's income-producing assets, the four ships, are all mortgaged to HSH; the income streams from the ships are likewise assigned to HSH; and any insurance proceeds received from the ships are also assigned to HSH.  Debtors have no unencumbered assets.  The secured debt of HSH amounts to over $55 million.

59.     The second factor listed in *C-TC 9th Avenue Partnership* is that the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors.  Here, the claims of unsecured creditors are being paid through the Critical Vendor Orders and will soon disappear entirely.  No unsecured creditor has appeared at any hearing or the creditors' meeting and there have been no volunteers for the committee of unsecured creditors.

60.     The third *C-TC 9th Avenue Partnership* factor is that the debtor's one asset is the subject of a foreclosure as a result of arrearages or default on the debt.  Debtors are in default on the loans from HSH, having failed to pay $6 million in tranches due.  HSH terminated the First Loan Agreement and had notified the Charterers of Debtors' default and the assignments of earnings, and was on the verge of terminating the Second Loan Agreement and taking steps to foreclose on its collateral when the bankruptcy proceeding was filed.

80357110v4

61.     The fourth *C-TC 9th Avenue Partnership* factor is that the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending foreclosure action.  All of Debtors' unsecured creditors are being paid from revenues generated by the ships, and that the ships are generating revenue sufficient to pay current operating expenses.  Only the secured creditors HSH and KBC are not being paid. The budgets prepared by Debtors do not even include a line item for debt service.  It appears that Debtors' inability to pay extends only to its secured lenders, so Debtors' financial difficulties are clearly focused on its secured lenders, and in particular, on HSH.  Debtors have indicated that the real estate mortgaged to KBC will be sold so that KBC can be paid, leaving HSH's loans as the only unpaid claim.  The fifth *C-TC 9th Avenue Partnership* factor, that the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights, is clearly present here.  Debtors filed for Chapter 11 protection only after HSH terminated the Loan Agreement I and indicated it would terminate the Loan Agreement II and had taken steps to foreclose on its collateral.

62.     The sixth *C-TC 9th Avenue Partnership* factor is that the debtor has little or no cash flow, and the seventh *C-TC 9th Avenue Partnership* factor is that the debtor cannot meet current expenses.  Here, the Debtors do have some cash flow from the Charters, but the cash flow is insufficient to pay both operating expenses and debt service.   Debtors have sought to lock-in this position by assuming the Charters, thereby guaranteeing that there will be no funds to service the debt.  In addition, all of the cash flow from the Vessels is assigned to HSH, and is no longer property of the Estate, as discussed above.

63.     The final *C-TC 9th Avenue Partnership* factor is that the debtor has no employees. Debtors do have employees, most of whom are family members of Mr. Terechtchenko or his main

80357110v4

assistant.   None are located in the United States. The situation of the Debtors matches or is substantially similar to most of the *C-TC 9th Avenue Partnership* factors indicating bad faith in filing a bankruptcy petition.

64.      In addition to the general factors that indicate bad faith, it appears in this case that on the eve of bankruptcy Debtors arranged a secret deal with the charterer of the Vessels, Pola Maritime in order to benefit one of Debtors' largest creditors, "Wingol".   It is undisputed that Pola was informed of the pending bankruptcy before it was filed. (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015 at 71).  It was after informing Pola of the impending bankruptcy that Debtors renegotiated the charters to reduce the previously agreed charter rates by $2.7 million over the three year span of the charters. (*Id.* at 74-75).   Although Debtors claim the reduction was innocent, it appears that it was motivated by the Debtors' desire to benefit Wingol.  Perhaps not coincidentally the amount of the reduction in the charter hire for the three Vessels already chartered to Pola was $2.7 million. (Ex. C, Transcript of hearing, dated as of April 16, 2015 at 41).   Debtors owe Wingol approximately $3 million plus interest. (*Id.* at 44).   As Debtors' principal Mr. Terechtchenko admitted, "Wingol, it's the company which we-whom we dealt a long time ago and they are helping us from time-to-time." (Ex. B, Transcript of Meeting of Creditors, dated April 15, 2015 at 62). When Mr. Terechtchenko was asked if Wingol and Pola have any ownership interest in common he replied "maybe".  Counsel for Debtors clarified that "we think they're affiliated in some way, Wingol and Pola." *Id.* at 67.

Conclusion

Based upon the foregoing, HSH Nordbank AG respectfully requests that this Court (i)

issue an order confirming that the earnings of the Vessels are not part of the Debtors' estate, and

(ii) dismiss this bankruptcy proceeding or, in the alternative, abstain.

Respectfully submitted,

*/s/ Michael R. Enright*
Michael R. Enright
ct10286
Robinson & Cole LLP
280 Trumbull Street
Hartford, Connecticut 06103
Fax: 860 275 8299
Phone: 860 275 8290
menright@rc.com

and

John G. Kissane
Jane Freeberg Sarma
Watson Farley & Williams LLP
1133 Avenue of the Americas
11th Floor
New York, New York 10036
Fax: (212) 922 1512
Phone: (212) 922 2200
jkissane@wfw.com
jfreeberg@wfw.com

ATTORNEYS FOR
HSH NORDBANK AG

80357110v4

## **CERTIFICATION**

I hereby certify that the foregoing Motion was filed electronically with the ECF system on May 28, 2015, and therefore will be sent by email to those receiving email notices from the Court's electronic filing system.

/s/ *Michael R. Enright*
Michael R. Enright

80357110v4