UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

------------------------------------------------------------X
                                                            )
In re                                                       )    Chapter 11
                                                            )
SOBELMAR ANTWERP N.V., et al.[1]                            )    Jointly Administered Under
                                                            )    Case No. 15-20423 (AMN)
                            Debtors.                        )
------------------------------------------------------------X

## HSH NORDBANK AG'S MOTION FOR ADEQUATE PROTECTION AND TO LIFT THE STAY

Secured creditor HSH Nordbank AG ("HSH"), by and through its counsel, hereby submits this Motion for Adequate Protection and to Lift the Stay (the "Motion").

### I.     INTRODUCTION[2]

1.     Sobelmar Antwerp N.V. and its debtor affiliates in this case (collectively the "Debtors") filed a Chapter 11 petition on March 17, 2015 (the "Petition Date").

2.     The Debtors own four vessels, all of which are mortgaged to HSH as detailed below. HSH holds an assignment of all monies due or to become due under the charter contracts of the four vessels between Pola Maritime Ltd. ("Pola" or the "Charterer") and the Debtors (the "Charters"). HSH also holds an assignment of the earnings paid by the Charterer to the Debtors under the Charters (the "Hire"). The Debtors have no source of income other than the Hire paid by the Charterer.[3]

---

[1] Case No. 15-20423 – Sobelmar Antwerp N.V., Case No. 15-20424 – Sobelmar Shipping N.V, Case No. 15-20425 – SBM-1 Inc., Case No. 15-20426 – SBM-2, Inc., Case No. 15-20427 – SBM-3 Inc., Case No. 15-20428 – SBM-4 Inc.

[2] HSH refers to its Motion (1) to Declare the Earnings of the Vessels are Not Property of Debtors' Estate, and (2) to Dismiss or Abstain, dated May 28, 2015, and the Declaration and Opinion of Hendrik Stephen Brauns, and the exhibits thereto, dated May 22, 2015 in support thereof (ECF Nos. 124 and 124-1) for a more complete account of the background of this matter.

[3] *See* ECF No. 83-1.

**II.     RELIEF REQUESTED**

3.     HSH requests an order from the Court pursuant to §§361 and 363 of the Bankruptcy Code granting HSH the following relief:

4.     (1) Adequate Protection Under §361 of the Bankruptcy Code:

5.     First, that the Court order that the earnings of the Vessels (defined below), including the Hire, and any income of the Debtors constituting cash collateral, including the amounts currently held in Debtors' accounts at KBC Bank N.V., be deposited into the Debtors' HSH accounts and that the HSH accounts shall be the Debtors' operating accounts;

6.     Second, that the Court order the Debtors to provide updated and detailed financial statements and a budget, with documentary support for the contents thereof, including, for example, account statements and underlying transaction documents.

7.     Third, to permit HSH access to the Vessels, to place onboard the Vessels inspectors, marine engineers or other professional mariners to inspect the Vessels and locate the books and records, all to ensure adequate protection of HSH's collateral; and

8.     Fourth, that the Court order Debtors, who have agreed to reposition the Vessels as follows, to reposition the m/v KOVDOR from Egypt to Malta, and to reposition the m/v VYRITSA from Kaliningrad, Russia to Gdynia, Poland, where the m/v BRASSCHAAT and m/v ZARECHENSK will complete their final voyage and discharge, at HSH's expense and order that Debtors cooperate in the orderly turn-over of the Vessels to HSH.

9.     (2) Assumption and Assignment of the Charters Under §365 of the Bankruptcy Code:

10.    HSH requests that the Court order the Debtors to assume the Charters pursuant to §365 of the Bankruptcy Code, and to assign the Charters and certain other assets in which HSH holds a priority security interest (collectively the "Collateral") to HSH and/or HSH's nominee.

11.     (3) Lifting of the Automatic Stay Pursuant to §362(d) of the Bankruptcy Code

12.     Further, HSH requests that the Court lift the automatic stay with respect to the Vessels and all appurtenances remaining on board, including bunkers and lube oil, to (i) allow HSH to exercise its rights as mortgagee under the mortgages over each Vessel, (*see* the "Mortgages," attached hereto as Exhibits 1 through 4, at Art. II.1.b, and detailed below), to sell the Vessels in a public foreclosure or private sale, and (ii) require Debtors to cooperate in the sale of the Vessels and execute such documents as may be required to effect the sale and to enable the new owner(s) to delete the Vessels from the Marshall Islands registry and re-register the Vessels in such jurisdictions as the new owner(s) may choose.

## III.    FACTS[4]

### A.    The Loan Agreements

13.     The source of the above assignments were the two loans made by HSH to Debtors. The first, under a loan agreement dated June 25, 2007 with Debtors SBM-1 Inc., SBM-2 Inc. and SBM-3 Inc. (the "First Loan Agreement"), in the amount of $61,425,000.00 was for the purchase of m/v BRASSCHAAT ("BRASSCHAAT"), m/v VYRITSA ("VYRITSA"), and m/v KOVDOR ("KOVDOR"). HSH made a second loan to Debtors under a loan agreement dated December 20, 2007 (the "Second Loan Agreement" and together with the First Loan Agreement, the "Loan Agreements") with Debtor SBM-4 in the maximum amount of $21,000,000 for the purchase of m/v ZARECHENSK ("ZARECHENSK", and together with BRASSCHAAT, VYRITSA and KOVDOR, the "Vessels").

---

[4] HSH refers to its Motion (1) to Declare the Earnings of the Vessels are Not Property of Debtors' Estate, and (2) to Dismiss or Abstain, dated May 28, 2015, and the Declaration and Opinion of Hendrik Stephen Brauns, and the exhibits thereto, dated May 22, 2015 in support thereof (ECF Nos. 124 and 125) for a more complete account of the background of this matter.

14. The obligations of the Debtors to HSH under the Loan Agreements are secured by, *inter alia*, assignments of the earnings of the Vessels, including the earnings paid by Debtor Sobelmar Shipping N.V. ("Sobelmar Shipping") as bareboat charterer of the Vessels and the earnings received by Sobelmar Shipping from third party charterers (i.e. Pola). *See* ECF No. 124-1 at ¶¶4, 7, 14 and 15.

15. The Loan Agreements are fully cross-collateralized and the security provided by the Debtors pursuant to each of the Loan Agreements secures Debtors' obligations under both Loan Agreements. *See* ECF No. 124-1 at ¶¶8, 9.

16. Under the terms of the Loan Agreements, the Debtors assigned their earnings with respect to the Vessels as part of the collateral used to secure the Loan Agreements. *See* ECF No. 125 at ¶¶4, 7.

17. On June 3 and October 14, 2013, certain tranches under the First Loan Agreement became due and payable. Debtors failed to pay either of these tranches. Therefore, in 2014, HSH terminated the First Loan Agreement; as a result, the loan granted thereunder was accelerated and all amounts owing under the First Loan Agreement became due and payable. HSH was on the verge of terminating the Second Loan Agreement, and accelerating the loan thereunder, and taking steps to foreclose its collateral when the bankruptcy petition was filed. *See* ECF No. 124-1 at ¶12.

18. HSH has a first priority assignment on all earnings of the Vessels. *See generally* ECF No. 124 at ¶¶12-20; ECF No. 124-1 at ¶¶25, 26, 30-36.

19. As of December 19, 2014, the principal amount outstanding on both Loan Agreements was $55,733,350.55. ECF No. 124 at ¶9 (citing ECF No 124-1 at ¶¶3, 6).

20. HSH is a secured creditor as well as the largest creditor of the estate.

### B. The Charter Agreements[5]

21. Debtor Sobelmar Shipping owns the Vessels through four special purpose vehicles. In 2014, Sobelmar Shipping entered into three charters with Pola for the KOVDOR, BRASSCHAAT and ZARECHENSK. Each of these charters was for a period of 12 months at the rate of $9,000 per day. On or about December 2014, Sobelmar Shipping renegotiated the Charters, increasing the term to three (3) years at the same rate. ECF No. 83 at ¶¶7, 9.

22. Sobelmar Shipping renegotiated these charters yet again, after the Debtors informed Pola that they intended to file for bankruptcy protection. Sobelmar agreed to a reduction in the charter hire to $8,000 per day after the first six months of each three-year charter. This effectively reduced the amount to be paid to the Debtors' estate by $2.7 million over the life of the charters. ECF No. 83 at ¶10.

23. On March 10, 2015, just days before Debtors filed the Chapter 11 petition, Sobelmar Shipping agreed to charter the VYRITSA to Pola at the rate of $6,500 per day for the first year, and $8,000 per day for the final two years. This resulted in a reduction of $1.62 million over the term of the three-year charter for the VYRITSA, as compared to a rate of $9,000 per day as initially agreed to by Pola on the Debtors' other three vessels. *See* ECF No. 83 at ¶¶10, 11.

24. On April 7, 2015, the Debtors filed a motion to assume the four Charters (defined above at ¶2). *See* ECF No. 51.

25. Prior to the Debtors' motion to assume the Charters, and according to the Debtors, Pola withheld approximately $500,000 in Hire due to the Debtors. Notably, the $500,000 was paid only *after* the Debtors agreed to reduce the Charter rates, and after the Debtors filed the Motion to assume the Charters. ECF No. 83 at ¶12.

---

[5] HSH refers to the Objection of HSH Nordbank AG to Agreed Motion to Assume Charter Agreements with Pola Maritime Ltd., dated April 21, 2015, and the exhibits thereto, for additional details regarding the Charters. *See* ECF No. 83. There has been no decision on Debtors' motion to assume the Charters.

### C. Developments During the Pendency of this Proceeding

26. Under the terms of the Loan Agreements and the assignments of the earnings of the Vessels, the Hire paid by Pola was required to be deposited into the Debtors' HSH accounts. *See* ECF No. 124-7 at p. 6 ("… all Earnings and other moneys referred to herein shall be payable to the account of the Assignor… with HSH Nordbank AG, Hamburg…"). The Debtors had been complying with this requirement, however, on or around the Petition Date, the Debtors ceased depositing money into their HSH accounts. *See* ECF No. 124-36 (Transcript of Creditor's Meeting) at 58:10 – 59:9. Instead, the Debtors opened new accounts in Connecticut – purported DIP accounts, minimally-funded – and used existing bank accounts at KBC Bank N.V. ("KBC") to operate the entities. *See id.* As a result, HSH stopped receiving deposits, including any deposits reflecting the earnings of the Vessels, including the Hire due and owing by Pola in respect of the Charters.

27. The Debtors have moved this Court for an order "authorizing maintenance of existing bank accounts and cash management system." *See* ECF No. 8. As part of the motion, the Debtors requested "authority to close any of the [Debtors' existing] Accounts if… the Debtors determine that such action is in the best interest of their estates." *Id.* at ¶ 16. This includes the Debtors' accounts at HSH. *Id.* at Ex. A. Notably, HSH has consistently contested any such order and the Debtors' HSH accounts remain open.

28. HSH has made repeated requests for financial information from the Debtors, including for a wind-down budget, lists of trade creditors that may have maritime liens on the Vessels and supporting invoices, and income payable from Pola. Financial information that has been supplied by the Debtors has been sparse. Only on February 23, 2016 did Debtors provide a one-page estimate of liquidation sources and uses. However, all of the information provided by Debtors

lacks specificity and documentary support for the numbers included therein. HSH has not received details regarding the existing debts of the Debtors, anticipated debts and liabilities, possible maritime liens or the expected income.

29. Pola, the Charterer, has also indicated it will not comply with the terms of the Charters. First, upon information and belief, Pola has not paid the Hire it owes to the Debtors since approximately the end of January 2016. Second, Pola has issued notices of redelivery of the Vessels. Such notices are premature, as Pola has no legal grounds upon which to terminate the Charters under the terms of the Charters and applicable law, including Section 362 of the U.S. Bankruptcy Code. Third, HSH understands that Pola intends to deduct certain amounts from the Hire that Pola asserts, but refuses to substantiate, are owed to it by the Debtors.

30. Upon information and belief, the Debtors have been complicit in Pola's refusal to comply with the terms of the Charters. Specifically, the Debtors have effectively consented to the redelivery of the Vessels by Pola and the resulting termination of the Charters, despite HSH's written requests to the Debtors to refrain from alienating the Charters – one of the largest assets of the estate. Further, the Debtors have not made any affirmative efforts to seek recovery of past-due Hire (currently estimated by Debtors to be $650,000 based on information provided to them by Pola) or to enforce the terms of the Charters. Notably, Pola's estimate of $650,000 in outstanding Hire reflects deductions from Hire Pola intends to make for alleged but unsubstantiated set-offs.

## II. MOTION FOR ADEQUATE PROTECTION

31. In the first instance, HSH moves for an order from the Court granting it adequate protection, pursuant to §§361 and 363 of the Bankruptcy Code, as detailed herein.

### A. Debtors' Income and Earnings Should be Deposited into HSH Accounts

32. Pursuant to the terms of the Loan Agreements and notices of assignment, the Debtors had agreed to – and historically did – deposit earnings into their HSH accounts.

33. Since around the Petition Date, however, the Debtors have failed to comply with this requirement and instead earnings have been deposited into the Debtors' accounts at KBC.

34. The Debtors have moved this court to permit the Debtors to use the KBC accounts as the operating accounts for the companies. HSH has objected to this cash management plan for generally the reasons cited herein. In addition, KBC is also a secured creditor of Debtors and may assert a lien over the cash collateral of HSH.

35. The deposit of earnings into the KBC account, and the use of the KBC accounts as the Debtors' operating accounts, have resulted in a significant lack of transparency regarding the Debtors' resources, income, debits and general financial status. As a secured creditor and the largest creditor of the estate, this is a significant concern of HSH and has negatively impacted the possibility of a consensual settlement agreement.

36. In light of the above, HSH requests that the Court order that all amounts on deposit in the KBC accounts, and any income of the Debtors constituting cash collateral, including amounts currently held in Debtors' accounts at KBC, be deposited into HSH accounts.

### B. Debtors Should Provide Detailed Financial Information and Permit Inspection of the Vessels to Ensure the Collateral is Preserved

37. In addition to the decreased transparency resulting from the cessation of deposits into Debtors' HSH accounts, the Debtors have provided sparse financial information and indeed only

recently provided a very brief (one-page) wind-down budget.

38. The Debtors are obligated to provide financial information to HSH pursuant to the terms of the Mortgages, including financial statements and a list of trade payables. *See* Mortgages at §18.2.

39. Debtors have not provided back-up documentation for the information they have produced. Indeed, some of the information disclosed by Debtors is based only on numbers purportedly provided by Pola – again, without any documentation.

40. HSH has also requested – but has not been provided with - a list of trade creditors who may have maritime liens against the Vessels, which may have priority over HSH's mortgages.

41. The lack of information, particularly when combined with the cessation of deposits into HSH and the use of KBC accounts as the operating accounts, is entirely unsatisfactory and prejudices HSH's security interests.

42. HSH understands that Debtors have failed to pay the crew on board the Vessels. The crew's claim for wages constitutes a priority lien that could prime the HSH Mortgages. In addition, abandoning the Vessels without paying the crew not only endangers the crew that may be left without sufficient victuals, housekeeping and other necessaries, it may also result in the arrest of the Vessels by the crew, damage to the Vessels by the crew, and a significant penalty wage claim against the estate. *See Dziennik v. Sealift, Inc.*, 2009 WL 3245291, at *4 (E.D.N.Y. Sept. 30, 2009).

43. Under 46 U.S.C. §10313, a seaman is entitled to be compensated for his work aboard a vessel and to receive compensation within 24 hours after the discharge of cargo, or within four days after the seaman is discharged, whichever is earlier. 46 U.S.C. §10313(f). Notably, Section 10313 applies to a seaman in domestic or foreign ports. *Id.* at §10313(i); *see also* 46 U.S.C.

§10318 (Wages on discharge in foreign ports). The Vessels' masters or owners may be liable for penalties for late payment of two days' wages for each day payment is delayed. *See* 46 U.S.C. §10313(g)(1).

44. HSH has continuously requested financial and lien information from the Debtors, to little effect.

45. Therefore, HSH now asks the Court to order that the Debtors provide more information with respect to all financial information (including open invoices and details thereon), estimates and budgets, including documentary support for such information.

46. HSH also requests that the Court order the Debtors to provide information on existing and potential liens against the Vessels and supporting documentation in connection therewith so that HSH can pay off and satisfy those claims having priority over the Mortgages from the cash collateral, if sufficient, or by HSH if the cash collateral is insufficient.

47. HSH also requests that the Court order the Debtors to permit HSH to access the Vessels, to permit inspectors, marine engineers or other professional mariners on board to inspect the Vessels and locate the books and records of the Vessels, to safeguard critical information (such as log books, trading certificates, oil discharge logs, etc.).

48. The above is necessary to ensure that HSH's Collateral is preserved, and the limited assets of Debtors' estate protected.

49. Without this information and transparency, the assets of the estate may be improperly alienated. For example, estate assets should not be used to pay unsecured creditors (including but not limited to Pola and other creditors the Debtors may be motivated to prefer) at the expense of secured creditors like HSH.

### C. The Court Should Order the Debtors to Reposition the Vessels, as Debtors Agreed

50. Absent Court intervention and Debtors' cooperation, the Vessels may be abandoned in remote, unsafe or unsuitable foreign ports, incurring significant fees and possible liens that would have to be resolved before HSH could re-possess the Vessels (indeed, maritime liens for the supply of so-called "necessaries," like fuel, water, etc., may have priority over HSH's lien in some jurisdictions, as do claims for seaman's wages). One of the Vessels may be abandoned in Egypt and subject to arrest there. The chances of the Vessel languishing for years in Egypt as HSH attempts to resolve local claims and any associated matters is significant.

51. Therefore, HSH seeks that the Court order Debtors to immediately order the repositioning of the m/v KOVDOR from Egypt to Malta, and the repositioning of the m/v VYRITSA from Kaliningrad, Russia to Gdynia, Poland, all at HSH's expense for such voyages to be paid into Debtors' DIP accounts.

### D. The Court Should Order Debtors to Assume the Charters and Assign the Charters and Other Assets to HSH

52. As noted above, there are significant risks that the value of the estate – and the value of HSH's Collateral – has been compromised, and continues to be compromised without Court intervention.

53. In addition to the Vessels, the Charters with Pola are specifically tied to each of the four Vessels, such that the Charters may not be transferred to any other vessels (and indeed, the Debtors do not own any other vessels).

54. Further, these Charters represent significant value of the estate. The Hire agreed to by Pola in the Charters is currently significantly above market and the transfer of the Charters with the Vessels, in connection with HSH's right to sell the Vessels pursuant to the Mortgages, may

80418689v7

increase the value of the Vessels and consequently the value of the assets of the estate. The Charters by themselves, however, separated from the Vessels, have no value. Accordingly, HSH requests that the Court order that the Charters be assumed by the Debtors and assigned to HSH pursuant to Section 365 of the Bankruptcy Code so that some potential value might be salvaged from the valuable contracts.

55. A debtor-in-possession is required to exercise its fiduciary duties for the benefit of the creditors and shareholders. *See CFTC v. Weintraub*, 471 U.S. 343, 355, 105 S. Ct. 1986 (1985); *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 (2d Cir. 2005). It is the duty of a debtor-in-possession to maximize the value of the estate. *See In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997), *citing inter alia, In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987).

56. For example, Debtors have acquiesced to Pola's redelivery of the Vessels between 22 and 24 months prematurely, without any legal basis. The premature termination of the Charters was apparently acquiesced to by the Debtors, over the objections of HSH.

57. Each of the Vessels chartered to Pola generates approximately $3,000 or earnings over expenses *per day*. This represents a claim of approximately $8.1 million in damages against Pola through the end of the term of the Charters.

58. Therefore, HSH requests that the Court order the Debtors assume and assign the Charters (which are rendered valueless without the Vessels), any outstanding and forthcoming Hire payments, and the moneys held in the KBC account as cash collateral, to HSH.

### III. MOTION TO LIFT THE STAY

59. HSH requests that the Court lift the stay so that HSH may take such action against the Vessels, as authorized in the Mortgages, and other security documents, including selling the Vessels by private sale or foreclosure. The Debtors themselves have requested that they be permitted to turn-over the Vessels to HSH and have made it clear that they will not continue to operate the Vessels and may indeed abandon the Vessels.

60. Pursuant to Section 362(d), the Court shall grant relief from the automatic stay provided under Section 362(a), for cause, including lack of adequate protection. *See* 11 U.S.C. § 362(d)(1).

61. As detailed in HSH's motion to, *inter alia*, dismiss or abstain, dated May 28, 2015 (ECF No. 124, ¶¶ 23 *et seq.*), and incorporated by reference herein, the Debtors are unable to provide adequate protection for the use of HSH Collateral. The Debtors cannot pay the crew, cannot afford to maintain the Vessels, and cannot afford any emergency maintenance or repairs that may become necessary to deliver the Vessels to their final destinations. The most recent information provided by Debtors on March 1, 2016 shows that the crews are owed wages for all of January and February 2016, totaling approximately $500,000.

62. By virtue of accepting premature delivery of the Vessels without legal basis, the Debtors have effectively acquiesced to the resulting termination of the Charter which means that Debtors' source of income has disappeared. Considering that approximately $500,000 is owed the crew alone, whose claim primes the Mortgages, there is a significant risk that the value of HSH's Collateral has been, and will continue to be, eroded during this bankruptcy proceeding, and the Debtors do not have anything else to offer to HSH as adequate protection. In addition, the Vessels' maintenance is likely to suffer as the crew, if left unpaid, may ignore the Vessels.

63. The failure to provide adequate protection when the property is declining in value is a classic basis for granting relief from the stay for cause. *See In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 333 (Bankr. S.D.N.Y. 2001) (concluding cause for relief from the stay was established by the mortgageholder); *In re Thomas Parker Enters. Inc.,* 10 B.R. 783, 789 (Bankr. D. Conn. 1981). Where a debtor cannot provide adequate protection, the stay may be lifted so that the mortgagee may take possession of the vessels. *See, e.g., In re Balco Equities Ltd., Inc.*, 312 B.R. 734 (Bankr. S.D.N.Y. 2004) (lifting stay to allow mortgagee to take possession of two vessels constituting loan collateral where debtor could not provide adequate protection).

64. At present, the value of the outstanding loans to the Debtors under the Loan Agreements far exceeds the estimated value of the Vessels. *See* ECF No. 124-36 (Transcript of Creditor's Meeting) at 127:25 – 128:20. The Debtors themselves acknowledge that "market conditions are not adequate currently to support a plan of reorganization that could be confirmed without HSH's consent." ECF No. 233 at ¶10.

65. Pursuant to the terms of the Mortgages between Debtors SBM-1 Inc. (owner of the BRASSCHAAT), SBM-2 Inc. (owner of the VYRITSA), SBM-3 Inc. (owner of the KOVDOR) and SBM-4 Inc. (owner of the ZARECHENSK) (collectively the "Shipowners"), on the one hand, and HSH on the other, upon an Event of Default, as defined in the Mortgages, HSH as the Mortgagee is entitled to certain remedies. *See generally* Exhibits 1 – 4, at Art. II.1.b. An "Event of Default" under the terms of the Mortgages includes, among other events, any payment that has not been received by the Mortgagee when due, or any default by the Shipowner under any provisions of the applicable Loan Agreement. *See id.* at Art. II.1.a.

66. Among the rights afforded to HSH upon an Event of Default is the right "upon notice to the Shipowner [to] take and enter into possession of the Vessel, at any time, wherever the same

may be, without legal process, and if it seems desirable to the Mortgagee… sell such Vessel at any place and at such time as the Mortgagee may specify and in such manner and upon such terms and conditions as the Mortgagee may deem advisable, free from any claim by the Shipowner…" *Id.* at Art. II.1.b.v.

67. Pursuant to the terms of the Mortgages, HSH has power-of-attorney of the Shipowner. Specifically, upon an Event of Default, HSH "is hereby appointed attorney-in-fact of the Shipowner and is entitled to execute and deliver to any purchaser… said attorney-in-fact is hereby vested with full power and authority to make, in the name and on behalf of the Shipowner, a good conveyance of the title to the Vessel so sold." *Id.* at Art. II.3. Further, "the Shipowner will, if and when required by the Mortgagee, execute such form of conveyance of the Vessel as the Mortgagee may direct or approve." *Id.*

68. In connection with the exercise of its rights as Mortgagee, HSH may need the Debtors to execute certain documents or have the Court confirm HSH's power-of-attorney in order to have the Marshall Islands registry properly record any sale of the Vessels and to re-register the Vessels.

69. As such, HSH requests that, upon the relocation of the Collateral to safe ports, the Court lift the automatic stay with respect to the Vessels and all appurtenanced bunkers and lube oil, to (i) allow HSH to pursue its rights as a mortgagee as described above and (ii) require Debtors to cooperate in an orderly turn-over, including to execute documents required to re-register the Vessels and to provide necessary books and records, trading certificates, marine fuel delivery notes, and any other documents required to be maintained by applicable law and accepted management practices.

**Conclusion**

Based upon the foregoing, HSH Nordbank AG respectfully requests, first, an order for adequate protection from the Court (i) ordering the earnings of the Vessels, including the Hire and any other income received by the Debtors, and any income constituting HSH cash collateral, including amounts held in Debtors' KBC accounts, be deposited into the Debtors' HSH accounts and that the HSH accounts shall be the Debtors' operating accounts, (ii) requiring the Debtors to provide updated and detailed financial statements and a budget, with documentary support for the same, for an orderly wind-down of the Debtors' estate, (iii) ordering the Debtors to permit HSH access to the Vessels and to place on board the Vessels inspectors, marine engineers or other professional mariners to inspect the Vessels and locate books and records, and (iv) ordering Debtors, who have agreed to undertake these final voyages, to reposition the m/v KOVDOR from Egypt to Malta at HSH's expense, and to reposition the m/v VYRITSA from Kaliningrad, Russia to Gdynia, Poland, where the remaining two Vessels (BRASSCHAAT and ZARECHENSK) will complete their final voyage and discharge, and ordering the Debtors to cooperate in the orderly turn-over and transfer of the Vessels.  Second, HSH also requests that the Court order the Debtors assume and assign the Charters and other HSH Collateral to HSH and/or HSH's nominee.  Lastly, HSH also moves the Court to (i) lift the automatic stay so that HSH may exercise its rights as Mortgagee and (ii) require Debtors to cooperate in the sale of the Vessels, including executing such documents as may be necessary for the new owner(s) to de-register and re-register the Vessels.

Respectfully submitted,

*/s/ Michael R. Enright*
Michael R. Enright
ct10286
Robinson & Cole LLP
280 Trumbull Street
Hartford, Connecticut 06103
Fax: 860 275 8299
Phone: 860 275 8290
menright@rc.com

and

John G. Kissane
Watson Farley & Williams LLP
250 West 55th Street
31st Floor
New York, New York 10019
Fax: (212) 922 1512
Phone: (212) 922 2200
jkissane@wfw.com

ATTORNEYS FOR
HSH NORDBANK AG

## **CERTIFICATION**

      I hereby certify that the foregoing Motion was filed electronically with the ECF system on March 2, 2016, and therefore will be sent by email to those receiving email notices from the Court's electronic filing system.

      /s/ *Michael R. Enright*
      Michael R. Enright